**Dallas O. WILLIAMS, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 13626.**

United States Court of Appeals
District of Columbia Circuit.

Argued Oct. 8, 1957.

Decided Nov. 1, 1957.

Petition for Rehearing In Banc Denied
Nov. 22, 1957.

Mr. Nestor S. Foley, Washington, D. C., (appointed by this Court) with whom Mr. George Rublee, II, Washington, D. C., was on the brief for appellant.

Mr. John D. Lane, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Lewis Carroll and Thomas Flannery, Asst. U. S. Attys., were on the brief, for appellee. Mr. Milton Eisenberg, Asst. U. S. Atty., at the time record was filed, also entered an appearance for appellee.

Before BAZELON, FAHY and WASHINGTON, Circuit Judges.

BAZELON, Circuit Judge.

Appellant, having waived jury trial, was convicted on May 4, 1956, of assault with a deadly weapon, on an indictment returned in November 1949 for a shooting on September 26, 1949. It was his fifth trial and third conviction for that offense. The case is here for the third time.

His first conviction was reversed when the Government confessed error. The second and third trials resulted in mistrials. The conviction resulting from his fourth trial was reversed by this court, sitting in banc, because the trial court had denied appellant's motion for an adjudication of his competency to stand trial, as required by Perry v. United States, 1952, 90 U.S.App.D.C. 186, 195 F.2d 37. Between his first and second trials appellant was adjudicated incompetent and committed to St. Elizabeths Hospital. He was again adjudicated incompetent and committed to the hospital between his third and fourth trials and between his fourth and fifth trials. On his first conviction in February 1950, which was on three counts, appellant was sentenced to two to seven years on counts 1 and 2 and one year on count 3, all concurrent. The second conviction in December 1953 brought a sentence of three to nine years. The present sentence is one to three years. He has already been confined for a total of about seven years in the course of this long prosecution—about six years in

jail and about a year in St. Elizabeths Hospital. With time off for good behavior, his present sentence will have been served by September of 1958.

The principal defense at the trial under review was insanity. Appellant claimed that his mental illness had started long before 1949 and that the crime was a product of the illness. The Government's theory was that appellant had not been mentally ill at the time of the crime, but had developed "prison psychosis" as a result of subsequent confinement.

The grounds of this appeal are (1) that Williams was denied the speedy trial required by the Sixth Amendment [1] and (2) that the prosecution failed to sustain its burden of proving his sanity.

Whether long delay of prosecution requires dismissal of an indictment even if there is no showing that the delay prejudiced the accused need not be determined here.[2] The question here is whether, when such delay does result in prejudice to the accused, it is just to try him. The Government states that it would have moved for a dismissal of this indictment, were it not for its concern with appellant's dangerous recidivism.[3] It seems, therefore, to have recognized that it is unjust to try an accused after long and prejudicial delay.

■■■ The Supreme Court said in Beavers v. Haubert, 1905, 198 U.S. 77, 87, 25 S.Ct. 573, 576, 49 L.Ed. 950:

"* * * The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice."

To hold that delay occasioned by the accused's mental incompetence to stand trial always requires dismissal of his indictment would be to ignore the "rights of public justice." On the other hand, to resume the prosecution of the accused after long delay may in some circumstances violate his rights beyond the requirements of public justice. To sustain its right to try the accused seven years after the crime, the Government must show two things, in my view: (1) that there was no more delay than is reasonably attributable to the ordinary processes of justice, and (2) that the accused suffered no serious prejudice beyond that which ensued from the ordinary and inevitable delay. My colleagues do not reach the question whether the Government must make the

---

1. This constitutional question was raised by appropriate motion at the outset of the trial under review. Though it had also been raised by motion before the fourth trial, the question was not brought before us when the case was last here on the appeal from the conviction in that fourth trial. Therefore, in reversing that conviction and remanding the case for a new trial, we cannot be understood to have made any judgment as to whether such new trial was constitutionally permissible under the circumstances. We consider the constitutional question for the first time on this appeal.

2. See Petition of Provoo (United States v. Provoo), D.C.D.Md.1955, 17 F.R.D. 183, 203.

3. The prosecutor told the court, at the opening of the trial, "This man has the worst criminal record for violence I have ever seen." We are informed by the Government that he was convicted of attempted robbery in 1933; twice of assault and battery in 1934; of manslaughter in 1936; of assault and battery with intent to kill in 1940 and in 1941; of shooting with intent to kill in 1942; of assault with a pistol in 1944; of assault in 1945; of assault with intent to kill, assault with a dangerous weapon and carrying a dangerous weapon in 1949. In 1952, twelve days after he was released on bail to await his second trial for the present offense, he threatened someone with a pistol and was convicted of that offense. While on bail before his fifth trial in 1956, he committed another crime involving a pistol and was convicted of that crime a month after the present conviction. Williams told one of the court-appointed psychiatrists who examined him in 1953 that he had spent about 20 of his 39 years in jail.

first showing. They agree, however, that it must make the second where the delay has been substantial. Since the delay has been substantial and we are all agreed that the Government has failed to make the second showing, we hold the conviction should be reversed and the case remanded with instructions to dismiss the indictment. For my part, I would reverse upon the additional ground that the Government has failed to make the first showing. The remarks which follow relating to the nature of the delay are those of the writer alone.

### The Nature of the Delay

Undeniably the bulk of the seven-year delay in bringing appellant to the trial which resulted in his present conviction was a direct or indirect consequence of his mental incompetency. The accused's incompetency necessarily slows the judicial process. Such delay is inevitable. By the Government's construction of the facts, however, appellant's mental illness had not existed at the time of the crime or even at the time of the first trial, but was brought on by the pressure of imprisonment some time after his first conviction. If the judicial process could and should have been completed before appellant became ill, his eventual illness will not excuse a long-delayed prosecution.

Appellant's 1950 conviction was reversed on the Government's admission that it could not sustain it "because of the total lack of any instruction on the elements of the offense charged." The prosecution's recognition of its duty to confess error when error is clear is commendable. But the prosecution's confession came only after the lapse of more than two years. Except for this, there is no reason to believe that, if appellant was not ill at the time of the offense, a second trial could not have been completed before he became ill. Exactly when appellant's illness began, by the Government's theory, is not clear. The prison authorities noticed bizarre behavior on appellant's part some time in 1950, but it was not until June 28, 1951, that the Government filed the lunacy petition which led to appellant's incompetency adjudication on July 2, 1951. Instead of speedily admitting the invalidity of the first conviction and bringing appellant on for a second trial without delay, the Government postponed as long as possible the necessity of confessing error. It first contested the sufficiency of appellant's notice of appeal. Appellant had handed his notice of appeal to the deputy marshal for transmittal to the clerk of the District Court. The deputy marshal held the notice for five days before filing it, so that it reached the court on the eleventh day after sentence. On the ensuing issue of whether there was an effective notice of appeal, the Government contended in the negative until on February 23, 1951, we held the notice effective. Williams v. United States, 1951, 88 U.S.App.D.C. 212, 188 F.2d 41. When the time came for the Government to file its brief in the appeal, in which it would have had to take a position on the validity of the conviction, it moved instead that the appeal be held in abeyance pending restoration of appellant's competency, appellant having been declared incompetent just the previous month. It was not until April 17, 1952, after appellant was discharged from St. Elizabeths Hospital to the jail and moved for release on bail, that the Government made its confession of error. In the circumstances of this case, I cannot hold that there was no more delay than was reasonably incident to the ordinary processes of justice.

### Prejudicial Effect of Delay

 Whether or not the Government unreasonably extended the delay, we are agreed that the delay in this case was beyond the ordinary and that the extraordinary delay resulted in serious prejudice to appellant.

When prosecution is delayed because of the accused's mental incapacity to stand trial, the difficulty of determining

whether the accused was mentally responsible at the time of the crime is increased. Passage of time makes proof of any fact more difficult. When the fact at issue is as subtle as a mental state, the difficulty is immeasurably enhanced. Courts must on occasion risk the increased difficulty of proof. But the interest of justice requires that there be no difficulty which is reasonably avoidable. There is a duty to minimize the difficulty so that the judgment, when ultimately reached, may be relied on as the closest approach to truth of which the judicial process is capable. That duty rests upon the accused as well as upon the Government—upon the accused because his is the burden, in the first instance of making some showing of insanity, Davis v. United States, 1895, 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499; Tatum v. United States, 1951, 88 U.S. App.D.C. 386, 190 F.2d 612; Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430; Douglas v. United States, 1956, 99 U.S. App.D.C. 232, 239 F.2d 52; upon the Government because it has the burden, once there has been some showing of insanity, of establishing beyond a reasonable doubt that the crime was not the product of mental illness. *Ibid.*

The preparation of the psychiatric evidence which is required to prove an individual's mental condition at some past date is a very difficult task.[4] It is a task for which the accused generally lacks both financial[5] and intellectual capacity.[6] The facts required by way of psychiatric testimony are a "description and explanation of the origin, development, and manifestations of the alleged disease * * * how it occurred, developed, and affected the mental and emotional processes of the defendant * * *." Carter v. United States, 101 U.S.App.D.C. ——, ——, 252 F.2d 608, 617. The examinations conducted by the psychiatrists must be of a character they deem sufficient for the purpose of determining the facts required. If brief jail interviews with the defendant are inadequate for the purpose,[7] the defendant should be committed to a mental hospital where he can be examined under clinical conditions and for a long enough time to satisfy the psychiatrists. If the psychiatrists require more information about the defendant's background and history than they can obtain from him, an investigation should be conducted to obtain such information.[8] If there is reason to doubt the accuracy of information supplied by the defendant or his family or friends, the information should be checked by investigators.[9] If physical tests can help to determine the

---

4. See United States ex rel. Smith v. Baldi, 3 Cir., 1951, 192 F.2d 540, 565–566 (dissenting opinion of Chief Judge Biggs).

5. As is almost invariably true in these cases, appellant is a pauper.

6. The Government concedes that appellant's intellect, as measured by tests at St. Elizabeths Hospital, is no better than "dull." Earlier tests taken at D. C. General Hospital had indicated that he was a moron.

7. Drs. Groh and Cavanaugh testified at Williams' third trial, after a jail interview, that he was then grossly psychotic, but that they could not tell either how long he had been ill or what likelihood of recovery there was, unless they were given an opportunity for adequate examination and observation.

See, in this connection, the dissenting opinion of Chief Judge Biggs in United States ex rel. Smith v. Baldi, supra note 4.

8. Dr. Cruvant of St. Elizabeths Hospital testified at the third trial in 1953 that he would not be able to ascertain Williams' 1949 condition merely by examining him, but would require information from reliable sources about his background and behavior.

9. Dr. Gordon testified at the last trial, in 1956, that he had learned from Williams' sister that Williams had a long history of *grand mal* epileptic seizures. He said, further, that "if this information is at all valid," he might be able to be more definite about Williams' condition. It does not appear that any effort was made to ascertain whether the information was "valid."

existence or character of illness, such tests should be made.[10]

Indigent defendants of questionable mental capacity are obviously in no position to conduct these inquiries and whatever others may prove necessary. Their court-appointed attorneys are given no funds for the purpose. If the relevant facts are to be presented to the court, therefore, it must ordinarily be as a result of inquiries instituted by the Government. If, because the Government fails to sustain its proper burden, a case is left to be decided on less than the best possible psychiatric evidence, the inadequacy of the evidence is not a point in favor of the prosecution.[11]

In the case at bar, the Government not only failed to take any steps to ascertain the facts which would determine appellant's mental condition as it bore upon guilt or innocence, but resisted every defense attempt to produce those facts. The first psychiatrists to examine Williams after the date of the crime were Drs. Perretti and Gilbert whose reports led the Government to institute the lunacy proceeding on June 28, 1951. At the hearing on July 2, 1951, Williams' counsel sought to obtain from Dr. Gilbert a statement of opinion as to what Williams' condition had been in September of 1949. But the Government objected that the lunacy inquest was designed to determine only Williams' state of mind "as he comes before this Court, and I don't think counsel ought to inquire into whether or not he was insane at the time he committed a crime." The objection was sustained. A similar objection prevented the defense from eliciting Dr. Perretti's opinion. At the second lunacy inquest, on April 28, 1953, the Government again objected when the defense sought to question Dr. Perretti about Williams' September 1949 mental

condition, but the court allowed the question over the objection. The witness replied that because of Williams' "confusion," "it is impossible at this time to estimate the duration of this illness." When Williams was brought to trial for the third time, the doctors' testimony about his 1949 mental condition was concededly relevant. But too much time had already passed for the testimony to be useful. Dr. Perretti was unavailable and Dr. Gilbert had very little recollection of his early examinations of the defendant. He testified only to what had been recorded in his files about those examinations and he said the purpose of the examinations had been "to determine * * * was he sick enough to be in a hospital, or was he well enough to remain in jail."

Clutching for some way of establishing the insanity defense at that third trial, Williams' counsel filed motions for (1) appointment of psychiatrists to conduct new examinations to determine his condition at the time of the crime; (2) leave to employ psychiatrists of his own choice at the expense of the Government; and (3) leave to take the deposition of Dr. Perretti who had examined Williams "in 1950 and 1951 at various times but is, at the present time, incapacitated in the hospital." On the Government's opposition the second and third motions were denied and the first motion was at first denied but then granted in severely limited form. The court ordered that Drs. Robert H. Groh and John C. Cavanaugh examine Williams at the jail "at any time on January 31 or February 1st, 1953, in order to determine his mental condition as of September 26, 1949, and that upon completion of said examinations Doctors Groh and Cavanaugh shall report to the Court on Monday, February 2, 1953." The doc-

10. Dr. Gordon testified that "it is generally believed that epilepsy is the result of some, although not clearly definable organic lesion in the brain. Surely, there is what can be diagnosed cerebral disrhythmia, and that can be proven by electroencephalography, if it is at all there." On cross-examination, Dr. Gordon ad-

mitted that he knew of no electroencephalographic tests having been made on Williams. It does not appear from the record that such a test was made.

11. See Blunt v. United States, 1957, 100 U.S.App.D.C. 266, 275 note 23, 244 F.2d 355, 364 note 23.

tors examined Williams at the jail on Sunday, February 1, but their examination was futile in the light of its purpose. They found Williams then so hallucinated, delusionary and disoriented that he was unable to supply any of the facts about his background which they would need to determine the duration of his illness. Since they lacked the necessary facts, the doctors could state no opinion about Williams' mental condition in September 1949. So far as physical examination is concerned, Dr. Groh made a limited one, "because of our limited time and opportunity." Dr. Cavanaugh stated that to judge how long Williams had been ill would require more examination and observation than was made under the court's order. This one examination, limited as it was by time, circumscribed as it was by the absence of clinical facilities, and inhibited as it was by total lack of background information, was, so far as appears from the records of this long and repeated prosecution, the only examination ever made of Williams for the purpose of determining his 1949 mental condition.[12]

Although the Government knew that Williams' guilt or innocence would turn on the issue of his 1949 sanity and although it was informed by at least one of the St. Elizabeths doctors that the determination of his 1949 condition would require reliable data about his background,[13] it made no effort to obtain any such data or to verify the data supplied by Williams himself or by his family. For example, appellant claimed to have epilepsy and Dr. Gordon testified at the last trial that appellant's sister had informed him that appellant had been an epileptic. Yet the Government not only failed to investigate this claim, but, in cross-examination took Dr. Gordon to task for the limited extent to which he accepted the claim. Dr. Gordon, in the same connection, testified that electroencephalographic tests might disclose whether, as a result of epilepsy, Williams had a "cerebral disrhythmia." The Government, on cross-examination, made the doctor admit that, so far as he knew, no such test had been made. The Government itself never had such a test performed on Williams.

That the evidence produced by a proper and adequate investigation of the facts relating to the accused's mental condition at the time of the crime may prove that he was not mentally responsible will not, we assume, influence the Government in its pursuit of the facts—and, of course, it should not. Under our criminal jurisprudence, mentally responsible law breakers are sent to prison; those who are not mentally responsible are sent to hospitals. To that end the District Code makes possible a verdict of not guilty by reason of insanity, and directs that under such a verdict the defendant is to be confined in a hospital for the mentally ill until it is determined that he "has recovered his sanity * * * [and] will not in the reasonable future be dangerous to himself or others." D.C.Code, § 24–301(c), (d) and (e), as amended by the act of August 9, 1955, 69 Stat. 609, ch. 673, § 1. Two policies underly the distinction in treatment between the responsible and the non-responsible: (1) It is both wrong and foolish to punish where there is no blame and where punishment cannot correct.

12. At the opening of the fourth trial, the defense again requested the court to order a psychiatric examination to determine Williams' 1949 mental condition. The Government objected that "some new psychiatrist could [not] come into this case new and presume to give an opinion as to his mental condition in September of 1949" and "it would [not] serve any good purpose." The examination was not ordered.

13. Dr. Bernard A. Cruvant of St. Elizabeths Hospital, testifying at the third trial on February 2, 1953, analogized the problem of determining a defendant's past mental state to the problem of determining testamentary capacity after the testator has died. What is required, he said, is information from unbiased sources about the individual's behavior at the time in question and "observations of background from among impartial and disinterested persons."

(2) The community's security may be better protected by hospitalization under D.C.Code, § 24–301 than by imprisonment. Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 240 note 12, 239 F.2d 52, 60 note 12. If Williams' violent act in 1949 sprang from mental disorder —if, indeed, he has a mental illness which makes it likely that he will commit other violent acts when his sentence is served, imprisonment is not a remedy. Not only would it be wrong to imprison him, but imprisonment would not secure the community against repetitions of his violence.[14] Hospitalization, on the other hand, would serve the dual purpose of giving him the treatment required for his illness and keeping him confined until it would be safe to release him.[15] Society's great interest in the proper disposition of such cases would be disserved if the Government, in prosecuting them, adopted an attitude of passivity or resistance to the production of evidence.

In the light of the foregoing, we hold that appellant was denied a speedy trial. We reverse the conviction and remand the case to the District Court for dismissal of the indictment.

Appellant also contends that his conviction should be reversed because the evidence overwhelmingly establishes insanity at the time of the crime. Since the conviction is reversed on a different ground, we do not reach this contention. We may note, however, that if a judgment of acquittal by reason of insanity were entered, appellant would be committed to a mental hospital under D.C. Code, § 24–301, supra, until it should be determined that he would not "in the reasonable future be dangerous to himself or others." Considering the pattern of violence characterizing appellant's behavior since his adolescence and the Government's justifiable concern with his criminal recidivism, commitment of the appellant to a mental hospital might well have been the wisest and most desirable disposition of this case. In his three previous commitments to St. Elizabeths Hospital, appellant received medical treatment only to the extent necessary to restore the cognitive powers thought to be required for trial competency. If he were committed under D.C.Code, § 24–301 after acquittal by reason of insanity, he would presumably receive more therapy than in any of his previous commitments. Release from such commitment, requiring a determination of safety, would provide some assurance that, as a result of the therapy administered to him, he would not be likely in the reasonable future to pursue his former violent course. The present disposition of the case sets the appellant free some months before he might go free if he completed the sentence we hold to be invalid. It is open to the Government, however, to proceed for a civil commitment under D.C.Code, § 21–326, if it considers that, with Williams at large in his present state, "the rights of persons and of property will be jeopardized or the preservation of public peace imperiled and the commission of crime rendered probable."

Reversed and remanded with instructions to dismiss the indictment.

FAHY, Circuit Judge (separately concurring).

I am in general agreement with the analysis of the case made in Judge Bazelon's opinion and concur in reversal with directions to dismiss the indictment on the ground that appellant did not have the speedy trial to which he was entitled under the Sixth Amendment. The delays which preceded the last trial were substantial and seriously

---

14. Under his present sentence, Williams may be released by September 1958.

15. Williams' previous confinements in St. Elizabeths Hospital were solely for the purpose of restoring sufficient mental competency to permit him to be tried.

On none of the three occasions when the hospital discharged him was he certified as fully recovered and no longer dangerous. See Durham v. United States, 1956, 99 U.S.App.D.C. 132, 237 F.2d 760; Lyles v. United States, 101 U.S.App.D.C. —, — F.2d —.

prejudicial to the defense. And as pointed out by Judge Bazelon appellant has been confined for a total of about seven years, six of them in jail and more than a year in St. Elizabeths Hospital, though his original sentence was only from two to seven years.

The suggestion that the appropriate authorities consider proceedings looking toward a civil commitment under D.C. Code, § 21–326 holds promise of a disposition of the problem conducive to the interest of the public as well as of appellant.