Henry W. JACKSON, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 18225.

United States Court of Appeals
District of Columbia Circuit.

Argued June 1, 1964.

Decided Aug. 7, 1964.

Mr. William E. Rollow (appointed by
this court), Washington, D. C., for ap-
pellant.

Mr. Max Frescoln, Asst. U. S. Atty.,
with whom Messrs. David C. Acheson,
U. S. Atty., and Frank Q. Nebeker and
Joseph A. Lowther, Asst. U. S. Attys.,
were on the brief, for appellee.

Before BAZELON, Chief Judge, and
WRIGHT and McGOWAN, Circuit Judges.

PER CURIAM:

Appellant was tried without a
jury and convicted of narcotic viola-
tions. 26 U.S.C. § 4704(a); 21 U.S.C.
§ 174. The principal issue presented
here concerns his right to cross-examine
a police officer about the reliability of
the informant on whose report he was
arrested.

The Government's evidence was that
two police officers were approached on
the street by one Ethel Gaskins who
told them that a man of a certain de-
scription was then sitting in the Frank-
lin Delicatessen with narcotics on his
person. The officers entered the deli-

catessen and asked two men, one the appellant herein, to step outside so they could talk to them. Outside the store, while the police were asking questions, appellant started to run. An officer tackled him across the street from the delicatessen and recovered narcotics from his coat pocket.

Information received through an informant may be relied on if "the information given is sufficiently accurate to lead the officers directly to the suspect," Wong Sun v. United States, 371 U.S. 471, 480, 83 S.Ct. 407, 413, 9 L.Ed. 2d 441 (1963), "so long as a substantial basis for crediting the hearsay is presented," Jones v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960). Such a substantial basis exists where "[t]he informant had previously given accurate information. His story was corroborated by other sources of information. And petitioner was known by the police * * *." Id. at 271, 80 S.Ct. at 736. Thus there are "requirements of reliability and particularity," Wong Sun v. United States, supra, 371 U.S. at 479, 83 S.Ct. 407; the information must not be "too vague" or "from too untested a source." Id. at 482, 83 S.Ct. 407. Here our major concern is with the reliability of the informant as demonstrated by information she had previously given.

The police officer testified that his informant, Miss Gaskins, was reliable, but his judgment is not the final one. "[T]he deliberate, impartial judgment of a judicial officer" is required "to assess the weight and credibility of the information which the complaining officer adduces as probable cause." Id. at 481–482, 83 S.Ct. at 414. When a motion to suppress challenges the "probable cause for believing the existence of the grounds on which the warrant was issued," Rule 41(e), F.R.Cr.P., "[t]he judge shall receive evidence on any issue of fact necessary to the decision of the motion." Ibid. Thus the court, in determining probable cause, like the magistrate issuing a warrant, must be informed of the underlying circumstances from which the officers concluded that the informant was credible or his information reliable. See Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). And the evidentiary requirements are greater when, as here, a warrant is absent. Id., 378 U.S. at 111, 84 S.Ct. 1509.[1]

Here the police arrested appellant solely on the information obtained from this informant. As in Kelley v. United States, 111 U.S.App.D.C. 396, 298 F.2d 310 (1961), we can say that if appellant was not arrested when he was asked to step outside, he was certainly under arrest by the time he was escorted outside and questioned by the police. Under the circumstances, the issue of probable cause to arrest depends on the reliability of Miss Gaskins as an informant. But when the appellant, acting pro se, attempted to cross-examine the police officer about the reliability of Miss Gaskins' information on prior occasions, the trial court interjected: "No, we won't go into that. We are not going into that." For the reasons stated, it was error to rule out questioning as to the basis for the police officer's conclusion that the informant was reliable.

Without knowing what testimony the officer would have given, however, we do not know how prejudicial that error was. Therefore, without reversing the conviction, we remand the case to the District Court with directions to hold a hearing on the issue of Miss Gaskins' reliability. A new trial will be ordered if the hearing shows that the lower court's exclusion of this issue from trial was prejudicial. In the absence of a finding of prejudice, the conviction will stand. Any determination of the trial judge will, of course, be appealable to

---

1. Though Aguilar involved a search warrant, the Court noted that the Fourth Amendment "of course applies to arrest as well as to search warrants," 378 U.S. at 112, 84 S.Ct. 1513 n. 3, and thus drew upon both search and arrest cases in determining the Fourth Amendment's requirements.

this court. See Greenwell v. United States, 115 U.S.App.D.C. 44, 47, 317 F.2d 108, 111 (1963).

In view of this disposition, we do not reach the other issues on this appeal, including the one considered in Judge Bazelon's separate opinion. Since that issue has not been heretofore raised, it too may be the subject of a motion for new trial or other relief on remand.

Remanded with instructions.

BAZELON, Chief Judge (concurring in part and dissenting in part):

I agree with the court's opinion on the only issue it reaches. But I think the record discloses circumstances which, though not raised, amount to denial of a fair trial and plain error requiring reversal under Rule 52(b), F.R.CR.P. These circumstances relate to the presentation of appellant's insanity defense.

Henry Jackson, age 25, has been a drug addict since he was 12. On November 15, 1962, a prostitute he lived with told the police he had heroin. He was arrested and narcotics were found in his possession. He was sentenced to seven years in prison.[1]

Authoritative declarations from institutions in all three branches of Government recognize a relation between drug addiction and mental illness. The President's Advisory Commission on Narcotics and Drug Abuse: "Most drug addicts suffer from personality disturbances which * * * cover a wide range of psychiatric disorders." Final Report, at 54. Congress: "Drug addiction is not a disease but is a symptom of a mental or psychiatric disorder." H.R.REP.No. 2388, 84th Cong., 2d Sess. 54 (1956), U.S.Code Cong. and Adm.News 1956, p. 3293. The Supreme Court: "[I]t is generally conceded that a narcotics addict, particularly one addicted to the use of heroin, is in a state of mental and physical illness." Robinson v. California, 370 U.S. 660, 667, see n. 8, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962). Our court has recognized that "The defense of insanity based on drug addiction generally presents a jury issue as to criminal responsibility." Brown v. United States, 118 U.S.App.D.C. ——, 331 F.2d 822 (1964). In United States v. Prince, D.D.C. Crim. No. 349–63 (1963), a successful insanity defense was grounded in drug addiction.[2]

Before trial, the defendant had been committed to St. Elizabeths Hospital under D.C.CODE, § 24–301 for a 90-day mental examination. He was returned as competent to stand trial. The Hospital's report added:

"[H]e was actively addicted to drugs on or about November 15, 1962, and the criminal acts with which he is charged, if committed by him, were most probably related to that addiction. However, it is further our opinion that while Mr. Jackson shows some evidence of deviation from normal, it is not in sufficient

---

1. He was indicted in two counts. Under 26 U.S.C. § 4704(a) he was sentenced to 8 months to 2 years. Under 21 U.S.C. § 174, he was sentenced to 7 years, the sentences to run concurrently.

As in Hawkins v. United States, 109 U.S.App.D.C. 338, 340–341, 288 F.2d 122, 124–125 (1960) (concurring opinion): "* * * from all that appears in this record, appellant is nothing more than an unfortunate addict, with a 'tragic dependency on drugs' and no prior record of convictions—narcotics or otherwise. The statutory presumptions that make virtually every possessor of narcotics a 'pusher,' have caught appellant in a web of legislation, which is primarily designed to deter and punish professional peddlers and 'traffickers' in narcotics. Unfortunately, these statutes, which impose severe mandatory penalties that can neither be suspended nor diminished by probation or parole, are not calculated to provide 'the medical and rehabilitative treatment' which Congress recognized as essential 'to relieve [addicts] of their tragic dependency on drugs and to restore them to a constructive status in society.'"

2. See also United States v. Bell, D.D.C. Crim. No. 969–61 (1962); United States v. Purcell, D.D.C. Crim. No. 487–62 (1963); United States v. Wallace Carroll, D.D.C. Crim. No. 383–62 (1962).

degree to warrant a diagnosis of mental disease or defect at this time, nor is it probable that he was suffering from mental disease or defect on or about November 15, 1962, that resulted in the syndrome of drug addiction present at that time.

"Signed/ Dale C. Cameron, M.D.
"Superintendent
"St. Elizabeths Hospital"

Trial was set for 10 o'clock on September 16, 1963. At 9:30 court-appointed defense counsel moved for a mental examination, alleging *inter alia*: (1) Defendant refuses to assist in the preparation of his defense; and (2) defendant's past medical record indicated the presence of a mental disease.[3] This hearing followed:

"[Defense counsel]: If it please Your Honor, I have filed a motion for a mental examination.

"The Court: When did you file it?

"[Defense counsel]: Today. Mr. Lowther [the prosecutor] showed me that an examination had been made some time ago.

"The Court: You know under the rule that we have here you cannot, on the day the case is called for trial, file a motion for a mental examination. That is interrupting the ball game in the middle of the game. That is a stall, to use a vulgarism.

"That will be denied.

"Are you ready for trial?

"[Defense counsel]: I have been ready for trial—"

It would appear that counsel did not learn until the day of the trial that there had been a mental examination. He had been in the case one month. Other counsel had made the motion for mental examination and argued a preliminary motion to suppress evidence.

Before his trial began, Jackson announced in open court that he wanted to raise the insanity defense, citing his long addiction to drugs. But the court said: "The report from St. Elizabeths says you are not a mental case. Well, I will read specifically the report [reading] * * * How would that help you?" Later, however, when the defendant again asked to raise the defense, the court agreed to issue forthwith subpoenas for the doctors from St. Elizabeths who had examined the defendant.

Before the doctors appeared, the court asked defense counsel if he would be ready to question them. He replied: "Yes, I will be ready to proceed." Yet a few minutes before, when the defendant asked in open court for a new lawyer because "this attorney won't ['subpoena doctors in my case']", defense counsel had said: "This is the first time I ever heard him ask to subpoena a doctor. * * *" And this colloquy followed.

"Defendant: I told him to subpoena all the doctors in the case. I had a mental examination while I was at St. Elizabeths there. * * *

"Defense counsel: I have just heard of these doctors."

The St. Elizabeths psychiatrists were testifying in other cases, but when they had finished, they came directly to Jackson's trial. Defense counsel then said in a conference with the judge and prosecutor at the bench that the records he had obtained from the prosecutor and the short conversation he had just had with the doctors indicated that their testimony would not be helpful to the defendant, but that the defendant insisted on calling them. The doctors then took the stand, and defense counsel questioned them briefly. He did not ask about the extent of the doctors' contacts with the defendant. When one doctor mentioned that he had "reviewed" "information regard-

3. We cannot know what basis there was for counsel's allegation that defendant's "past medical record indicated the presence of a mental disease." Neither counsel nor anyone else revealed such information at trial, although one St. Elizabeths psychiatrist referred to "past episodes of confinement." See *infra*.

ing his past episodes of confinement," counsel did not ask what and when these were. He did not ask about the nature of Jackson's "deviation from the normal." He did not ask whether this deviation "substantially affects mental or emotional processes and substantially impairs behavior controls." McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962). He did not ask about the relationship between drug addiction and mental disease.

Called suddenly from other courtrooms and testifying largely from memory, without ward or personal notes,[4] the psychiatrists said flatly that Jackson had no mental disease. But their testimony gives no assurance that they could have answered questions about his background, his deviation from the normal, and the effect of drug addiction on his mental processes. We have said that "[t]he chief value of an expert's testimony in this field, as in all other fields, rests upon the material from which his opinion is fashioned and the reasoning by which he progresses from his material to his conclusion." Carter v. United States, 102 U.S.App.D.C. 227, 236, 252 F.2d 608, 617 (1957). It is for the trier of fact to decide the issue of responsibility. The psychiatrists here provided no data for decision.

It is conceivable that they did not even have the data.[5] Time and resources may not permit taking the psychosocial history of each person committed for a 90-day examination, or engaging in extensive personal interviews, or making a collateral investigation. Moreover, the sources of drug addiction and its relation to crime are problems on which psychiatrists disagree. Such factors no doubt make it difficult for psychiatrists from public institutions to testify, and we can only sympathize with them. But they should advise the court when they have been unable to make the kind of examination required by proper clinical standards because of lack of time, facilities or knowledge. Dr. Owens, a St. Elizabeths psychiatrist, recently testified: "[I]f you haven't done an adequate examination or complete examination, then you should not render an opinion as to the presence or absence of mental illness." Morgan v. United States, hearing on a 28 U.S.C. § 2255 motion, presently pending on appeal in this court. No. 18,178 (Transcript, p. 244).

Late in the trial, long after the psychiatrists had testified, the prosecutor "out of an abundance of caution * * * put in the record some of the medical stuff on this defendant over at St. Elizabeths, as counsel has seen it." He then read of prescriptions for Librium, Thorazine and Tofranil given the defendant, for short periods, in considerable quantities. The drugs were prescribed by Dr. Dabney, a staff psychiatrist, who was not present at the staff conference on the

4. The first doctor:

"Q. Doctor, did you mention that he had been on the violent ward there?

"A. I do not have his ward notes here so I do not know whether he had been on the violent ward or not. The point is I think when he was seen at the Staff Conference he did not show any symptoms referable to a mental disorder * * *."

The second doctor:

"Q. Did you prescribe any medication for Mr. Jackson at any time?

"A. Not to my knowledge, no.

"Q. Your records show no medication in regard to your services to Mr. Jackson?

"A. As a matter of fact, the records, which would include orders for medication are not available at this time. These are kept separately * * *."

5. There are presently 350 patients in the John Howard Pavilion, the maximum security section of St. Elizabeths, where most of the criminally insane are confined. Only two of the psychiatrists assigned to the Pavilion are certified by the American Board of Psychiatry and Neurology. There are, in addition, 6 staff psychiatrists, 4 of whom are eligible to take the examination for Board certification. The ratio of physicians (Board-certified and other) to patients in the John Howard Pavilion thus allows each patient about 4 minutes of medical attention a day. Hearings on H.R. 9072 before the Ad Hoc Subcommittee on St. Elizabeths, 88th Cong., 1st Sess., 1963.

defendant and was not subpoenaed to testify at the trial. After reading from the ward records, the prosecutor testified: "I may say that Dr. Dabney told me out in the hall this morning that on certain occasions people who are psychotic, if they are given large doses of Thorazine and so on, may appear to be all right. I thought the defendant should know that."

Defense counsel then said he was "satisfied with the recitals made by" the prosecutor and expressly declined to pursue the matter raised by the medical records. Yet the prosecutor's statement had shown there was a doctor who knew something bearing on the defendant's sanity and whose evidence was essential to a fair presentation of the defense. I think it appeared at this point, if not before, that more time was necessary for the preparation of the insanity defense. Though counsel did not request it, the court *sua sponte* might well have granted a continuance. Even one day would have allowed defense counsel to investigate the nature and extent of the mental examination from which the psychiatrists concluded that Jackson had no mental disease. Since Jackson had no real opportunity to present a plainly non-frivolous defense, he did not have a fair trial.

Ten years after Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430 (1954), this record would indicate that meaningful exploration of the issue of criminal responsibility is lacking in this jurisdiction.[6] That issue is ordinarily for the jury. But the necessary corollary of the rule allowing laymen to decide responsibility is that they must be given the fullest information possible. The *Durham* rule

is designed to provide such information by allowing a wide range to expert testimony. But the vitality of legal rules depends on the adversary system, in which "specially motivated persons, and parties and their counsel, * * * makes the best possible case for their side. The parties present 'their' witnesses, 'their' versions of events, 'their' theories of law. Such a model requires that the parties engage in a constant process of 'correction' of the adversary's material. Witnesses must be penetratingly cross-examined, opposing versions of events comprehensively presented, and conflicting * * * theories crisply propounded." Goldstein & Fine, *The Indigent Accused, the Psychiatrist, and the Insanity Defense,* 110 U. OF PA.L.REV. 1061 (1962).

Here the adversary system collapsed. Defense counsel and prosecutor had not studied the available information in order to present it effectively. They joined with the court in agreeing that there was no valid insanity defense. The psychiatrists did not appear as expert witnesses to present and explain their viewpoints, but as triers of fact to announce their verdict of "no mental illness." The only person who took any steps to get before the court the information on which the defense depended was the prosecutor. The only adversary was Jackson himself, who insisted on his defense but lacked the financial and intellectual capacity to present it without help.

A meaningful insanity defense requires adequate resources for examination, exploration and preparation. Medical and legal resources are scarce and Jackson is not even among the "deserving poor." He is indigent, uneducated, unemployed, and he has engaged in con-

---

6. See also Simpson v. United States, 116 U.S.App.D.C. 81, 320 F.2d 803 (1963), in which it appeared at trial that the defendant might have a substantial defense of insanity. I said:

"It is clear * * * that no trustworthy conclusion regarding the presence or absence of 'epileptic equivalent' could be reached in the context of this case without a thorough-going investigation to determine whether defendant has, as he claimed, a history of blackouts with loss of memory. There is nothing in the record, however, indicating whether any such investigation was ever conducted on behalf of this indigent defendant of 'borderline intelligence,' either by court-appointed counsel, by St. Elizabeths Hospital, or by the Government."

duct offensive to society. A drug addict most of his life, he is doubtless part of the shadowy sub-culture of those who live *for* their craving and *by* robbery, shoplifting, prostitution, or peddling. At the hospital, the hours necessary to discover the roots of his "tragic dependency on drugs" would deprive of care someone else whose need might be greater and who might respond more readily to treatment than a drug addict. Time which the St. Elizabeths psychiatrists spend in court testifying is time taken from their work at the hospital. Court-appointed counsel who give valuable days without compensation are often assigned to disturbed defendants like Jackson shown by the record to be suspicious and demanding. Moreover, there are a great number of indigent defendants and relatively few lawyers familiar with criminal trial practice. Hence, it is very often necessary to appoint lawyers who understandably know little about such practice, and even less about the special difficulties of presenting the insanity defense. The Bar has responded beyond the call of duty and good will. But how much

preparation in depth can we expect under such circumstances?

Yet we need to know the personal or social causes of the behavior we condemn not only to assess culpability but to rehabilitate the individual and to remove those causes if possible so others will not fall into the same pit. The need for prevention is plain since prison sentences too often result only in the return to the streets of more dangerous criminals. We have devised rules, institutions and procedures for determining responsibility and for discovering and preventing causes of crime, but we have not been willing to allocate sufficient resources to the task.

Economy of resources and of human feeling may be among the reasons no one wanted to discover why Jackson acted as he did. Unless society is to abandon inquiry into the culpability of people like Jackson, or dispense with culpability as a basis for condemnation, we cannot countenance such reduced justice. Even an inadequate system must provide more than Jackson had. There should be a new trial with a fair opportunity to present his defense.