**Nathaniel B. HENDERSON, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

**No. 18249.**

United States Court of Appeals
District of Columbia Circuit.

Argued June 2, 1965.

Decided April 15, 1966.

Mr. Morton M. Winston, Washington, D. C., with whom Mr. Albert J. Beveridge, III, Washington, D. C. (both appointed by this court), was on the brief, for appellant.

Mr. John R. Kramer, Asst. U. S. Atty. at time of argument, with whom Messrs. David C. Acheson, U. S. Atty. at time brief was filed, and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee.

Before BAZELON, Chief Judge, and FAHY and LEVENTHAL, Circuit Judges.

ORDER filed December 27, 1965

PER CURIAM.

On consideration of appellant's motion for leave to withdraw his appeal, in part, or in the alternative for leave to withdraw his appeal in whole, and no opposition having been filed thereto, it is

Ordered by the court that appellant's motion for leave to withdraw his appeal in whole is granted.

PER CURIAM.

In view of Chief Judge Bazelon's opinion we have written this short memorandum to explain our action in granting appellant's motion to withdraw his appeal. We do not feel it necessary to present our views on the various matters discussed by the Chief Judge. The motion came to us through counsel from an appellant adjudged competent to stand trial in a ruling not challenged before this court. There was a psychiatric report—not conclusive, by any means—finding him competent to make determinations affecting his appeal.

At the trial the Government contended that assuming appellant had been suf-

5. See *supra* note 4.

fering from a mental illness the actions for which he was tried were not the product thereof. There was psychiatric testimony to that effect. Apparently the jury came to that conclusion. His counsel advised us that the sole contention they were pressing was that the court erred in failing to direct a verdict for defendant. This honored appellant's determination that it was not in his interest to obtain a reversal for the purpose of a new trial.

The prison authorities did not find that he required treatment in a mental institution. He anticipates release upon service of his sentence in the not distant future, and will even be eligible for parole this spring. The case was argued June 2, 1965. On December 7, 1965, he asked dismissal of the appeal, reporting that he had been making good progress in his prison adjustment, including correspondence courses, and concluding for additional reasons that further maintenance of the appeal was not in his interest.

The case is marginal. We are aware as is appellant that he may need continuing psychiatric assistance, but we did not believe under the circumstances that the interest of justice required further proceedings against his will. Accordingly, on December 27, 1965, we entered an order granting appellant's motion to dismiss the appeal.

BAZELON, Chief Judge (concurring).

My brethren view the issues underlying the appellant's request to withdraw this appeal as "marginal." [1] Because I find them most difficult and troubling I feel they require discussion.

On the one hand, the record is replete with evidence that appellant suffers from a serious mental disorder, which casts substantial doubt on his competence to abandon this appeal. It also reveals serious inadequacies in the trial of the is-

sue of criminal responsibility, which cast substantial doubt on the validity of the conviction appealed. I do not refer to inadequacies in the sense of mistakes of trial court or counsel, but rather to the shortcomings in the system presently governing the administration of the insanity defense. On the other hand, appellant will soon be eligible for parole, and does not wish to impede its consideration by the pendency of this appeal.

At trial his defense was that he did not commit the robbery and that, even if he did, it was the product of a mental disease. The jury found against him [2] and he brought this appeal alleging that the trial judge erred (1) in denying his motion for a directed verdict on the issue of criminal responsibility; and (2) in denying his request to submit to the jury the issue whether he committed the act charged before introducing evidence on responsibility.

The pre-trial and trial record disclose undisputed evidence of serious mental illness. Shortly after appellant's indictment on February 5, 1963, the trial court committed him to Saint Elizabeths Hospital for a ninety-day mental examination to determine his condition at the time of the offense and his competence to stand trial. The Hospital reported:

> As a result of our examinations and observation, it is our opinion that Nathaniel B. Henderson is mentally competent for trial, although he is suffering from a mental disease, Schizophrenic Reaction, Chronic Undifferentiated Type. It is also our opinion that he was suffering from this mental illness on or about [the date of the alleged robbery] * * *.

At trial, appellant called two Saint Elizabeths psychiatrists, Drs. Dabney and Owens. Dr. Dabney testified that, on the basis of his observation of appellant twice a week for ninety days and letters he received from appellant every day, it

1. Appellant requested leave to withdraw all issues of insanity and all others which would require a new trial, or in the alternative to dismiss the appeal entirely. Since the only substantial issues in this appeal either relate to insanity or would require a new trial, the motion is in effect one to withdraw the appeal.

2. Appellant was sentenced to from two to five years' imprisonment.

was his conclusion that appellant was suffering from "schizophrenic reaction, chronic undifferentiated type," and that the alleged act was definitely a product thereof. He described the symptoms in detail, further stating on cross-examination that appellant could not distinguish between right and wrong and would have committed the alleged robbery even if a policeman had been at his elbow. Dr. Owens, who examined appellant only once, testified that appellant was suffering from a mental illness symptomized by impaired judgment, marked depression, preoccupation with suicidal thoughts, one suicidal gesture during hospitalization, and "thinking that was approaching paranoid ideas." The Government presented no countervailing psychiatric testimony.

The post-trial record casts still more doubt on appellant's competence to abandon his appeal. After taking this appeal, appellant instructed his counsel not to urge any issue of insanity. Because counsel was "unable to determine whether appellant's direction * * * [was] materially or principally motivated by a mental condition (schizophrenia) and by a desire to punish himself," he moved this court on February 25, 1964, to consider appellant's mental capacity to waive the insanity issues. He submitted with his motion an affidavit from Dr. Dabney stating, on the basis of his pre-trial observations, that appellant's "present insistence not to appeal on the basis of mental illness * * * is a reflection of the features of his mental disorder, with which he still seems to be suffering." This court then requested Dr. Lanham, Director of the Legal Psychiatric Service, to examine appellant. He reported:

It is my opinion that Henderson continues to suffer from a Schizophrenic reaction, chronic undifferentiated type, although as is characteristic in that illness, many of his more blatant and more bizarre symptoms are now in remission. *It is further*

*my opinion that his direction to his counsel to abandon the issue of insanity on appeal is materially motivated by his impaired mental condition.*

Not infrequently, persons who have had a psychotic break wish to deny that they are in any way mentally ill, when their acute symptoms are in remission. I believe this is true in Henderson's case. Furthermore, he manifests many distinctly paranoid trends.
* * *

In addition, even though he denies his mental illness, he recently got into the prison hospital and refused to leave until he could see the prison doctor and get tranquilizing medication. Thus, while appealing for medical and psychiatric help on the one hand, he rejects the possibility of obtaining it on the other. This kind of dualism is not infrequently encountered in schizophrenic persons who must be hospitalized against their protestations, while at the same time attracting attention to themselves as mentally disturbed. I believe that his judgment and reality testing are quite impaired. * * * [T]here is no question that the end result of his behavior is self-defeating, unrealistic, and *self-punitive.* [Emphasis supplied.]

This report of serious mental illness required a full and scrupulous inquiry into appellant's competence to abandon the issue of insanity which was pressed so hard at trial. We therefore remanded to the District Court for such a hearing, "in order that the record before this court may be supplemented." To insure the fullest inquiry, we specifically empowered the District Court: "to order additional mental examinations of appellant; to receive from counsel suggested questions of fact for consideration in the course of any mental examinations of appellant and for determination by special findings of facts by the court; to hold evidentiary hearings; * * * to make additional findings of fact, and conclusions of law. * * *"[3]

---

3. Cf. Hansford v. United States, 122 U.S.App.D.C. 320, 353 F.2d 858, decided Oct. 29, 1965 (Bazelon, C. J., dissenting).

On remand the District Court ordered appellant examined at D. C. General Hospital. On December 8, 1964, the Hospital reported, without explanation or clarification, that "the defendant understands the possible arguments that might be made in his appeal, as well as the consequences of rejecting any one of them," and that "the defendant is of sound mind, able to stand trial and to assist counsel in his defense." [4] But while appellant was still in the Hospital, and before the District Court acted finally on our remand, appellant indicated that he had again changed his mind and again wished to raise issues of insanity on appeal. Accordingly no further inquiry was pursued to resolve appellant's competence to abandon those issues. The hearing contemplated by our order of remand was not held, the contemplated supplemental record not developed.[5] Because of appellant's change of heart, in April 1965 we dismissed as moot counsel's motion for a determination of appellant's competence to abandon issues of insanity on appeal. Meanwhile, the record relevant to that question had been supplemented only by the Hospital's conclusory boilerplate report.

But nine months later, appellant again changed his mind for the third time. He again wants to abandon certain questions of insanity. Hence we are again confronted with the issue of his competence to make such decisions and we are still without an adequate basis for resolving that issue.

The need for such a basis is especially critical since, as will plainly appear hereafter, the issue of appellant's sanity was determined on an inadequate record. Despite the uncontroverted evidence of mental illness and Dr. Dabney's categorical statement that the alleged robbery was a product thereof, the Government presented no countervailing psychiatric evidence. It sought to discharge its burden of establishing sanity beyond a reasonable doubt [6] by a vigorous cross-examination designed to show that Dr. Dabney's investigative efforts were inadequate. This disclosed that the Doctor failed to interview appellant's mother, sisters, or wife, all of whom played an integral role in his diagnosis; that he did not consider the notes of nurses assigned to appellant's ward; that he did not rely on social worker's interviews with family members which were in the hospital file; and that his opinions were based entirely on appellant's uncorroborated representations, which the Government "coupled with a showing of defendant's untrustworthiness as a source of information." The trial judge stated that "if accepted

---

**4.** The Hospital gave a similarly boilerplate response to a request by appellant's attorneys for supplementary information: "[Appellant's] reasoning process about the conduct of his appeal and other legal matters related to his conviction for robbery is rational and * * * he is competent to make intelligent choices among available alternatives open to him on this matter." This court has criticized such conclusory reports. See Leach v. United States, 122 U.S.App.D.C. 280, 282, 353 F.2d 451, 453 (1965), and cases cited therein.

**5.** The record was also supplemented by a memorandum to the trial judge from appellant's probation officer describing his interviews with the examining doctors concerning appellant's "treatability." It had been the District Court's hope "that if the psychiatrists recommended treatment or felt that treatment would benefit Henderson, the possibility that Henderson would * * * move under Rule 35, Fed.R.Crim.P., might afford a solution by way of placing Henderson on a probation conditioned on his taking such treatment as would be recommended, ultimately leading to out-patient treatment." The District Court concluded that the reports and interviews "now seem to afford no basis for this" because the psychiatrists did not view appellant as a "treatable prospect." The probation officer's memorandum did not discuss appellant's competence to abandon issues of insanity on appeal. In any event, the memorandum is no substitute for the hearing, with examination of witnesses, required for a judicial determination of competency.

**6.** See, e. g., Davis v. United States, 160 U.S. 469, 486–488, 16 S.Ct. 353, 40 L.Ed. 499 (1895); Tatum v. United States, 88 U.S.App.D.C. 386, 389, 190 F.2d 612, 615 (1951).

at face value, Dr. Dabney's testimony would give rise to, if not compel, a reasonable doubt." It follows that but for the Government's showing of the inadequacy of Dr. Dabney's examination the trial judge would have directed—or the jury returned—a verdict of acquittal by reason of insanity.[7]

Appellant, like most criminal defendants in the District of Columbia, is indigent,[8] and had therefore to rely on the Government to perform the mental examination upon which his insanity defense depended.[9] Such an examination must be broad enough to illuminate the issue of criminal responsibility.[10] If an examination by the Government-employed doctors is deficient, "the deficiencies could have been remedied by the prosecutor, who knew from the beginning that insanity at the time of the * * * [alleged offense] would be the critical issue in any trial ultimately held." [11] If the investigative effort was inadequate, the Government is "remiss if anyone; certainly not * * * [the indigent defendant]." [12] Only the Government has the resources to remedy any deficiencies in these examinations.[13]

When sanity is in issue, an adequate and comprehensive mental examination is essential to a fair trial.[14] The Government may not fail to satisfy its statutory, if not constitutional,[15] obligation

---

7. Dr. Owens testified that appellant could tell right from wrong and would not have committed the alleged robbery with a policeman at his elbow. But Dr. Owens's opinion was circumscribed by his limited observation of appellant. And this testimony in terms of the "right and wrong" and "policeman at the elbow" tests means no more than that the accused did not display "particular symptoms which medical science has long recognized do not necessarily, or even typically, accompany even the most serious mental disorder." Durham v. United States, 94 U.S.App. D.C. 228, 242, 214 F.2d 862, 876, 45 A.L. R.2d 1430 (1954).

8. See JUDICIAL CONFERENCE OF THE DISTRICT OF COLUMBIA CIRCUIT, REPORT OF THE COMMITTEE ON PROBLEMS CONNECTED WITH MENTAL EXAMINATION OF THE ACCUSED IN CRIMINAL CASES, BEFORE TRIAL 17 (1965).

9. McDonald v. United States, 114 U.S. App.D.C. 120, 312 F.2d 847, 849, n. 4 (1962); Williams v. United States, 102 U.S.App.D.C. 51, 55–58, 250 F.2d 19, 23–26 (1957); Brennan, *Law and Psychiatry Must Join in Defending Mentally Ill Criminals*, 49 A.B.A.J. 239 (1963); Goldstein & Fine, *The Indigent Accused, the Psychiatrist, and the Insanity Defense*, 110 U.PA.L.REV. 1061, 1062 (1962).

10. Cannady v. United States, 122 U.S.App. D.C. 120, 122–123, 351 F.2d 817, 819–820 (1965); Mitchell v. United States, 114 U.S.App.D.C. 353, 316 F.2d 354 (1963); Winn v. United States, 106 U.S.App.D.C. 133, 270 F.2d 326 (1959).

11. Blunt v. United States, 100 U.S.App. D.C. 266, 275, 244 F.2d 355, 364, n. 23

(1957). See Williams v. United States, 102 U.S.App.D.C. 51, 55–56, 250 F.2d 19, 23–24 (1957):
"If the psychiatrists require more information about the defendant's background and history than they can obtain from him, an investigation should be conducted to obtain such information. If there is reason to doubt the accuracy of information supplied by the defendant or his family or friends, the information should be checked by investigators. If physical tests can help to determine the existence or character of illness, such tests should be made."

12. Blunt v. United States, *supra* note 11 at 275, 244 F.2d at 364, n. 23. See Wright v. United States, 102 U.S.App. D.C. 36, 41, 250 F.2d 4, 9 (1957): "If the Government feels that psychiatric opinions which come into evidence ought to be based on examinations of greater scope and intensity than has been the practice heretofore, it can and should arrange to have such examinations made."

13. Goldstein & Fine, *supra* note 9; *cf.* REPORT OF THE ATTORNEY GENERAL'S COMMITTEE ON POVERTY AND THE ADMINISTRATION OF CRIMINAL JUSTICE (1963).

14. See Goldstein & Fine, *supra* note 96 at 1963–64.

15. *Cf.* Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); Coppedge v. United States, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962); Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). See also Rollerson v. United States, 119

to provide it and then complain at trial that it was not provided. Otherwise the Government is like the proverbial child who murders his parents and pleads for mercy because he is orphaned.

It is not suggested that the prosecutor surrender the cross-examination of psychiatric witnesses. The adversary system requires acute cross-examination of the psychiatrists' conclusions.[16] But the Government may not rely upon its failure to afford a mental examination based upon adequate investigative efforts.

The record upon which the sanity issue was determined was also inadequate in other respects. Appellant's pretrial motion for a mental examination showed that (1) he had a "voluminous" medical record from at least two federal prisons where he was regarded as a "paranoid personality with strong passive dependencies" and "significant problems in the sexual area"; (2) his wife observed that during the six months before his pretrial examination, he had "become extremely nervous, depressed and morose, and [had], on several occasions during this time, wept alone and in the presence of others for no apparent reasons," and that he expressed a belief that his relatives hated him, although she observed no evidence of such hatred; (3) a person who had employed him six days a week for ten weeks before the alleged robbery observed that he "exhibited signs of unusually severe nervousness and seemed to be mentally disturbed"; (4) a United States Probation Officer, who held a master's degree in psychiatric social work, observed that appellant "appeared depressed and manifested personality disturbances"; (5) appellant related to counsel a detailed history of abnormal behavior from the time he was fifteen, including convictions for sodomy and indecent exposure. None of the evidence available from the prison records, the wife, the employer, the Probation Officer, or the detailed history of abnormal behavior was presented at trial.

Other deficiencies in the defense appear from the trial transcript. For example, Dr. Dabney said he relied on certain tests. He was not asked, and did not say, what these tests were, what they were designed to show, or what they did show. He said his only personal contact with appellant was on his "rounds." He was not asked, and did not explain, the nature of these "rounds" and the extent to which they involved personal contact. Dr. Owens said his diagnosis of mental illness was consistent with appellant's "history prior to hospitalization." He was not asked, and did not detail, what that history was and why it was consistent. Since our decision in Durham v. United States,[17] we have often expressed concern about such failures.[18]

Ordinarily the jury has, with the aid of the court's instructions, the task of determining the question of responsibility.[19] The underlying assumption is that it will be fully informed. This re-

---

U.S.App.D.C. 400, 407, 343 F.2d 269, 276 (1964):
"Where the community fails to supply —for those who cannot—the effort and resources required for an adequate exploration of the issue, the trial becomes a facade of regularity for partial justice."

16. See, *e. g.*, Rollerson v. United States, 119 U.S.App.D.C. 400, 343 F.2d 269 (1964); Carter v. United States, 102 U.S. App.D.C. 227, 236, 252 F.2d 608, 617 (1957).

17. 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430 (1954).

18. See, *e g.*, Rollerson v. United States, 119 U.S.App.D.C. 400, 343 F.2d 269 (1964);

Jackson v. United States, 122 U.S.App. D.C. 324, 353 F.2d 862, decided Nov. 4, 1965, adopting, 118 U.S.App.D.C. 341, 343, 336 F.2d 579, 581 (1964) (separate opinion); Heard v. United States, 121 U.S. App.D.C. 37, 45, 348 F.2d 43, 51 (1965) (statement of Bazelon, C.J.).

19. See, *e. g.*, Blocker v. United States, 116 U.S.App.D.C. 78, 320 F.2d 800, cert. denied, 375 U.S. 923, 84 S.Ct. 269, 11 L.Ed.2d 167 (1963); McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962) (en banc); Hawkins v. United States, 114 U.S.App.D.C. 44, 310 F.2d 849 (1962); Durham v. United States, 94 U.S.App.D.C. 228, 241, 214 F.2d 862, 875 (1954).

quires a diligent effort by counsel to present all the relevant evidence and to present it so that the jury can understand it.

The jury is not adequately informed by expert testimony given only in terms of the legal standard or in terms understandable only by other experts, nor by a description limited to the present symptoms of the accused. It needs the sort of information the expert ordinarily requires and relies upon in making a diagnosis in the clinic. This includes, *inter alia,* detailed information about the defendant's background, his family situation, his relationships with others, and earlier manifestations of mental disease.[20]

The duty to inform does not end with the presentation of such material; counsel must insure that the significance and meaning of the information is clearly explained by the witnesses. Defenses other than insanity may involve matters familiar to the jurors; in such cases they can sift and appraise the evidence without special assistance.[21] Inconsistencies or gaps may be readily apparent. But the defense of insanity involves matters which are complex and unfamiliar to most jurors. Deeper understandings and knowledge are necessary before the evidence can be intelligently used to reach a reasoned verdict.

Ideally, of course, counsel should be sufficiently knowledgeable in behavioral phenomena to marshal the relevant materials and assist the jurors in understanding them. This would help to avoid a determination based on uninformed speculation and pure chance rather than on a rational analysis of the evidence. But the attorney, generally appointed by the court, is not ordinarily—and cannot be expected to be—so knowledgeable. Without expert assistance it is often difficult if not impossible for him to determine what facts are relevant or how to discover them and then present them in a meaningful way.[22] In this case, as in others, the inadequate presentation of the insanity defense may not fairly be attributed to counsel; it results from the complex nature of the question and the failure to afford counsel the requisite expert assistance.

We need no longer indulge the fiction that all members of the bar can proceed without such help. In August 1964, Congress provided that "Counsel for a defendant who is financially unable to obtain * * * expert * * * services necessary to an adequate defense in his case may request them in an ex parte application." 18 U.S.C. § 3006A(e). Such services should not only enable counsel to determine more effectively the relevant facts and how and where they can be found but also should provide the necessary information for properly examining

---

20. See generally Rollerson v. United States, 119 U.S.App.D.C. 400, 343 F.2d 269 (1964), and authorities cited therein; ENGLISH & FINCH, INTRODUCTION TO PSYCHIATRY 70–100 (2d ed. 1957); NOYES & KOLB, MODERN CLINICAL PSYCHIATRY 130–69 (5th ed. 1958); JUDICIAL CONFERENCE OF THE DISTRICT OF COLUMBIA CIRCUIT, REPORT OF THE COMMITTEE ON PROBLEMS CONNECTED WITH MENTAL EXAMINATION OF THE ACCUSED IN CRIMINAL CASES BEFORE TRIAL 31–33 (1965).

21. Defenses based on claims such as alibi, self-defense, entrapment, etc., ordinarily involve factual questions within the realm of the jury's experience.

22. "Court-appointed counsel who give valuable days without compensation are often assigned to disturbed defendants * * *. [T]here are a great number of indigent defendants and relatively few lawyers familiar with criminal trial practice. Hence, it is very often necessary to appoint lawyers who understandably know little about such practice, and even less about the special difficulties of presenting the insanity defense. The Bar has responded beyond the call of duty and good will. But how much preparation in depth can we expect under such circumstances?"
Jackson v. United States, 118 U.S.App. D.C. 341, 347, 336 F.2d 579, 585 (1964) (separate opinion).

and cross-examining expert witnesses.[23] It is now up to the bar and the medical profession, with the cooperation of the courts, to establish procedures by which this assistance can best be provided.[24]

As appears from the foregoing, appellant's present motion to abandon certain insanity issues on appeal is, in effect, a request to waive his right to a fair trial. It also appears that there has been no adequately informed determination that he is competent to do so. Ordinarily in such circumstances, a new trial would be appropriate. However, additional considerations are present which militate against it. Appellant will be eligible for parole shortly and for release upon expiration of his sentence in about a year. A successful defense of insanity would result in mandatory commitment to a mental institution for an indefinite period. Thus appellant's decision to withdraw his appeal appears reasonable on its face. It might be unfair to subject him to any other course. If he is a danger to the community because of his illness, civil commitment is available.

I have a sense of frustration about appellant's imprisonment without adequate proof of criminal responsibility. But I reluctantly accede to his wish to abandon his rights since this may well be in his best interest.[25] However, we should understand that his conviction may not be immune from collateral attack if he should change his mind once again.

23. See generally Goldstein & Fine, *The Indigent Accused, the Psychiatrist, and the Insanity Defense*, 110 U.Pa.L.Rev. 1061, 1064–66 (1962).

24. This may be panels of experts available in such cases, individual appointments, or some other system.

25. Decision of the appeal would also require resolution of appellant's substantial contention that he has a right to submit

to the jury the issue whether he committed the act charged before introducing evidence on responsibility. This court has recognized the potential prejudice to an accused resulting from a combined trial of sanity and commission of the act charged. See Trest v. United States, 122 U.S.App.D.C. 11, 350 F.2d 794 (1965); Harper v. United States, 122 U.S.App.D.C. 23, 350 F.2d 1000 (1965).