Frederick L. SALZMAN, Appellant,

v.

UNITED STATES of America, Appellee.

James E. LOWERY, Appellant,

v.

UNITED STATES of America, Appellee.

Nos. 21172, 21201.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 12, 1968.

Decided Oct. 4, 1968.

As Amended Nov. 4, 1968.

Mr. Stephen F. Owen, Jr., Washington, D. C., with whom Mr. E. Riley Casey, Washington, D. C. (both appointed by this court) was on the brief, for appellant in No. 21,172.

Mr. Robert M. Kennan, Jr., Washington, D. C., with whom Mr. Franklin M. Schultz, Washington, D. C. (both appointed by this court) was on the brief, for appellant in No. 21,201.

Mr. William M. Cohen, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for appellee. Mr. William G. Reynolds, Jr., Asst. U. S. Atty., also entered an appearance for appellee in No. 21,201.

Before BURGER, WRIGHT and ROBINSON, Circuit Judges.

BURGER, Circuit Judge:

These are consolidated appeals from convictions for robbery, 22 D.C.CODE § 2901 (1967).[1]

The complainant, one James Walker, while awaiting a bus decided to take a walk; he became confused as to directions and entered Franklin Park at 14th and K Streets. He testified that there he was approached by a man whom he subsequently identified as Appellant Salzman, and engaged in conversation. Another man, identified at trial as Appellant Lowery, joined the conversation and offered Walker a drink which he refused. Appellant Lowery then broke the bottle over a park bench, pressed the jagged edge to Walker's throat, and demanded his money and valuables. Appellant Salzman removed $37.00 from the billfold and confiscated Walker's high school ring and gold watch. Walker promptly notified police and estimated that the time of the robbery was approximately 1:00 a. m., August 16, 1966, and further described both assailants.

After an unsuccessful search of the park in the company of the two police officers, Walker joined Detective Muns of the Park Police for a search by patrol car at about 2:00 a. m. Shortly after 4:30 a. m. they responded to a call from another Park Police officer, Officer McAllister, who testified that he had first encountered Appellant Salzman and another at approximately 2:00 a. m. in a nearby park and warned them against public drinking. He did not arrest them at that time since they were not sufficiently intoxicated. At about 4:00 a. m. the officer again encountered the same two men and arrested them for public drunkenness. When he placed Appellant Salzman in the squad car he saw Appellant "ease something under the rear seat." The officer seized the object which matched the description of Walker's ring as set forth in an earlier police radio broadcast. Subsequent search revealed Walker's gold watch. The officer then called Detective Muns and Walker to the scene.

Walker identified Salzman as one of the robbers although he could not be sure of his identification since he observed him in the back seat of the police car.

---

1. Decision in this case was withheld pending disposition of Powell v. State of Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968).

The following morning Walker made a positive identification and thereafter identified Appellant Salzman at trial. After the initial confrontation Walker and Detective Muns retrieved the broken bottle from the trashcan at the park. Latent fingerprints taken from the bottle were subsequently identified as matching the fingerprints of Appellant Salzman.

During the corresponding period of time on August 16, Detectives Butler and Henningar had responded to an emergency call from George Washington Hospital at approximately 2:00 a. m., where they spoke with Appellant Lowery who was awaiting treatment for knife wounds which he claimed he received in a robbery. Because of his condition, the officers decided to contact him later. They did, however, examine the scene of the alleged robbery of Appellant Lowery and concluded that it could not have occurred in the fashion described by him. Having also observed Appellant Lowery's bloodsoaked shirt at the hospital, the two detectives realized it matched the description—a white "T-shirt" with a blue neck band—given by Walker.

These officers then met Walker and accompanied him to Appellant Lowery's hotel address. The detectives spoke with Appellant Lowery about his shirt and were informed that he had left it at the hospital. As the three men were leaving, Walker, who had been standing in the hall outside the room, identified Appellant Lowery as one of his robbers. Walker also identified him at trial. Further search for the shirt proved fruitless.

## I.

### LOWERY'S APPEAL

■ Appellant Lowery raises two issues on appeal: first that the prosecutor was erroneously permitted to argue to the jury that the shirt described by Walker and the shirt described by police officers who visited Appellant Lowery in the hospital was the same shirt, and that the subsequent disappearance of the shirt evidenced a consciousness of guilt. Appellant Lowery characterizes the argument as one of misstatement of fact and points to alleged discrepancies in the descriptions of the shirt. This contention is without basis. The record afforded a substantial evidentiary basis from which the prosecutor could predicate the argument as a matter of reasonable inference; obviously this is why trial counsel made no objection.

The second error claimed relates to the jury's request, some three hours after they began deliberations, that they be advised as to:

(1) the time of the robbery of Appellant Lowery in the park;

(2) the time that Appellant Lowery was admitted to the hospital; and

(3) the time of the robbery of Walker.

Prosecution and defense counsel agreed that Walker testified that the robbery occurred about 1:00 a. m. but neither was able to remember the other two times. Both counsel then agreed to a suggestion of the trial judge that if the times were available in the transcript, the court reporter would read them to the jury. The jury was then recalled and informed that the court reporter would examine her notes to see if the information was available, and if it showed the exact times the jury would receive it.

The following morning, out of the presence of the jury and in response to the jury's first question, the court reporter read a portion of the testimony of the officer who interviewed Appellant Lowery at the hospital:

We went back to Franklin Park and looked it over and we responded to Headquarters, our Headquarters, and we discussed this matter with Detective Harold R. Muns, and he had a similar type case that occurred in the park at the same time, approximately 1:00 a. m., and in talking to him he gave us a description of the two in his particular case.

Counsel made a hearsay objection, conceding that he should have made it during trial. After consideration, the trial judge permitted the jury to receive this

testimony and the court reporter read it to the jury and stated that there was no testimony concerning the time Appellant Lowery was admitted to the hospital, and the time of the robbery of Walker was approximately 1:00 a. m.

■ Appellant Lowery now claims that the testimony given in response to the first question was hearsay; that the testimony concerning the last question was given in response to a leading question; that the reading of both portions to the jury prejudiced him, particularly since the trial judge did not offer any additional cautionary instructions. The hearsay challenge comes too late.

Many occasions arise in trial when a valid objection could be made to testimony on hearsay or other grounds and is passed because, for example, counsel knows the fact in question can be established by other admissible evidence; or he may waive the point because to prove it otherwise may emphasize it unduly. Or he may simply desire to save time and consider it unimportant.

■ When a jury submits questions during its deliberation, it is within the discretion of the trial judge to deny or permit the request. United States v. Jackson, 257 F.2d 41, 43 (3d Cir. 1958); Henry v. United States, 204 F.2d 817, 820 (6th Cir. 1953).[2] The trial judge did not abuse his discretion in permitting the jury to receive the testimony. Indeed, the procedure was a commendable and genuine effort to avoid any prejudice to Appellant Lowery.

## II.

### SALZMAN'S APPEAL

Appellant Salzman makes two claims on appeal both of which relate to his defense at trial. He presented a defense that he had been adjudged a "chronic alcoholic" upon his arrest for drunkenness the same morning as the alleged crime, and, as such, lacked the specific intent necessary for the crime of robbery. In support of this defense he introduced his prior record of some twenty convictions for drunkenness and the testimony of a Health Department clinical specialist that he was a "chronic alcoholic."

Appellant Salzman first claims that the trial judge erred in failing to distinguish between voluntary and involuntary alcoholism in his charge to the jury. He relies on Easter v. District of Columbia, 124 U.S.App.D.C. 33, 36, 361 F.2d 50, 53 (1966), in which we said:

It should be clear * * * that chronic alcoholism resulting in public intoxication cannot be held to be criminal on the theory that before the sickness became chronic there was at some earlier period a voluntary act or series of acts which led to the chronic condition. A sick person is a sick person though he exposed himself to contagion and a person who at one time may have been voluntarily intoxicated but has become a chronic alcoholic and therefore is unable to control his use of alcoholic beverages is not to be considered voluntarily intoxicated.

While not objecting to an instruction on the effect of Appellant Salzman's ability to form the necessary specific intent, the government at the close of the trial requested an instruction to the effect that chronic alcoholism was itself not a defense to a crime except public drunkenness and could be considered only as to the issue of specific intent.

■ Defense counsel requested an "intoxication" instruction without further elaboration other than a request that the jury be permitted to consider the fact of chronic alcoholism. He filed no written requests for an instruction and agreed to the instruction as given. The essence of the instruction was that intoxication was not a defense to crime, but the degree of intoxication was relevant in the determination of the element

2. On the necessity of restraint which the judge must exercise in order to avoid giving undue emphasis to the repeated testimony *see* Corley v. United States, 124 U.S.App.D.C. 351, 354, 365 F.2d 884, 887 (1966) (dissenting opinion).

of specific intent. The instruction concluded:

> Now, chronic alcoholism is not a defense to the crime of robbery charged in this indictment, but the defendant Salzman's condition of sobriety may be taken into consideration by you in determining whether he was so intoxicated as to be incapable of forming the required specific intent.

Since defense counsel affirmatively agreed with the form of the instruction as given and made no objection on the ground now urged, we are precluded from considering the issue unless it is plain error. FED.R.CRIM.P. 52.

■ The facts of this case—the events preceding the robbery, the robbery, the testimony of the police officer who warned Appellant Salzman and later arrested him, and the act of concealing stolen property—show that the jury found no probative significance in Appellant Salzman's condition of chronic alcoholism. Under these circumstances we find no error.

■ Appellant Salzman's second claim of error is the alleged failure of the trial judge to instruct the jury that chronic alcoholism may be a defense to a crime of specific intent where the crime arose out of, or was a product of the chronic alcoholism. First, no request for such an instruction was made. FED.R.CRIM.P. 30.[3] Second, the entire thrust of the defense was directed at the lack of specific intent because of Appellant's intoxication. There was no proffer of testimony suggesting a relationship between chronic alcoholism and the alleged

offense. Thus, there was no factual foundation upon which the trial judge might have predicated the instruction which Appellant now says the court should have given.

## III.[4]

Our effort in cases over the past dozen years or more to establish a broad scope for the jury's inquiry into the mental and emotional processes of the accused has not led us to treat either narcotics addiction or alcoholism as a per se basis for the application of the *Durham-McDonald* rule. McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847 (1962) (*en banc*); Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430 (1954). The experience under *Durham* had tended to become a trial-by-label and in *McDonald* we sought to direct the inquiry into broad factual areas which would compel expert witnesses to testify in terms of the impact of disease on volition and capacity to control behavior. This deemphasized the importance of the psychiatric classifications of disease and directed more emphasis on the nature and the consequences of any mental abnormality as it related to criminal responsibility. Despite our continued admonitions against excessive reliance on labels and medical classifications[5] the tendency to rely on classifications and labels continued and as a result we found it necessary to adopt what is, in effect, a legal definition of mental disease and defect as they relate to the legal problems of defining and discerning the presence or absence of criminal responsibility. *McDonald, supra.* Even after *McDonald,*

---

3. *See* Osborn v. United States, 385 U.S. 323, 332 n. 11, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); Gaskins v. United States, U.S.App.D.C. (No. 20,252, decided December 20, 1967); Kelly v. United States, 124 U.S.App.D.C. 44, 361 F.2d 61 (1966).

4. All members of the panel join in Parts I and II of this opinion affirming the convictions in these cases. In Part III Judge Burger expresses his own views.

As to Part III Judges Wright and Robinson have also written separately.

5. *E.g.*, Carter v. United States, 102 U.S.App.D.C. 227, 236, 252 F.2d 608, 617 (1957). *See also* Campbell v. United States, 113 U.S.App.D.C. 260, 266–273, 307 F.2d 597, 603–616 (1962) (dissenting opinion); Blocker v. United States, 110 U.S.App.D.C. 41, 50, 288 F.2d 853, 863 (1961) (en banc) (concurring opinion).

some of the problems continued to appear.[6]

Appellant Salzman would apparently have us take a step backward. He would have the words "chronic alcoholic" elevated to a label of mental disease or defect.[7] But criminal responsibility does not turn exclusively on the label attached to the accused's condition. Here the label derives from a treatment statute, 24 D.C.CODE § 501 et seq. (1967), a classification which is precisely what this court said in *McDonald, Harried,* and *Washington* "may be inappropriate" for determinations of criminal responsibility.

Nor do I find anything in *Easter* which supports Appellant Salzman's position. In fact, we made it quite clear there that

the defense of chronic alcoholism to a charge of public intoxication is not rested upon mental disease as relieving of mental responsibility, but upon the absence of responsibility incident to the nature of this particular sickness as set forth by Congress.

*Easter, supra,* 124 U.S.App.D.C. at 36 n. 8, 361 F.2d at 53 n. 8.

Paralleling our effort to withdraw from trial-by-label was the corresponding desirability of having expert testimony explain the dynamics of the alleged illness, its developments, manifestations, and effect on capacity to control behavior and on the mental and emotional processes of the accused, and, of course, whether the illness had impaired or destroyed those controls so that the accused was no longer a "free agent."

The sole testimony here on cognition and volition was that of a Health Department social worker who described a chronic alcoholic as one who lacks the capacity to control *his drinking.* Such testimony, of course, is not enough, except where the charge is public drunkenness; it does not give the jury a satisfactory basis for determining criminal responsibility.

Finally, I see no basis which warrants a treatment of the relationship between chronic alcoholism and criminal responsibility different from that which this court has imposed on the relationship between narcotics addiction and criminal responsibility. First in Heard v. United States, 121 U.S.App.D.C. 37, 348 F.2d 43 (1964), and most recently in Gaskins v. United States, *supra* note 3, we summed this up:

Our decisions also define boundaries within which the interplay of drug addiction is confined. The fact of addiction, standing alone, does not permit a finding of mental disease or defect. Evidence of that fact, however, has probative value in conjunction with evidence of mental illness, and the effect of a deprivation of narcotics on behavioral controls is a relevant circumstance. We have recognized, too, that extensive and protracted addiction may so deteriorate such controls as to produce irresponsibility within our insanity test.

*Id.* (slip op. p. 3) (footnotes omitted).[8]

---

6. *E.g.,* Washington v. United States, 129 U.S.App.D.C. 29, 390 F.2d 444 (1967); Harried v. United States, 128 U.S.App. D.C. 330, 389 F.2d 281 (1967); Henderson v. United States, 123 U.S.App.D.C. 380–386, 360 F.2d 514, 518–520 (1966) (concurring opinion); Rollerson v. United States, 119 U.S.App.D.C. 400, 343 F. 2d 269 (1964); Castle v. United States, 120 U.S.App.D.C. 398, 402, 347 F.2d 492, 496 (1964) (concurring opinion), cert. denied, 381 U.S. 929, 85 S.Ct. 1568, 14 L.Ed.2d 687 (1965).

7. In this context it is interesting to note that not only is there no commonly ac-

cepted definition of alcoholism, but counsel in *Easter* argued that it was not a form of mental illness but a separate and distinct illness.

8. *See also* Green v. United States, 127 U.S.App.D.C. 272, 383 F.2d 199 (1967); Greene v. United States, 122 U.S.App. D.C. 150, 352 F.2d 366 (1965); Castle v. United States, 120 U.S.App.D.C. 398, 347 F.2d 492 (1964), cert. denied, 381 U.S. 929, 85 S.Ct. 1568, 14 L.Ed.2d 687 (1965); Brown v. United States, 118 U.S.App.D.C. 76, 331 F.2d 822 (1964); Hightower v. United States, 117 U.S. App.D.C. 43, 325 F.2d 616 (1963), cert.

The logic of the *Heard* and *Gaskins* holdings—that narcotic addiction, standing alone, is not "some evidence" of mental disease or defect to raise the criminal responsibility issue—is equally applicable to the case of chronic alcoholism. Except in a charge of drunkenness, it is not per se sufficient to raise the issue. The accused must show some evidence that he has lost the capacity to control his behavior not simply with respect to drinking, but in other contexts as well.[9]

Affirmed.

J. SKELLY WRIGHT, Circuit Judge:

Appellant Salzman raises questions regarding the relationship of chronic alcoholism to criminal responsibility. Specifically, he argues that the jury should have been allowed to consider, and to acquit if it so found, whether the act with which he is charged—robbery— was the product of a disease from which he claims to be suffering—chronic alcoholism. Because the record is inadequate to present this claim, his conviction is affirmed. However, because one of the opinions in this case proceeds to discuss this question, and because the problems are important, I set forth my own views.

I

The question is whether a person claiming to be a chronic alcoholic should be acquitted of any crime if the jury finds that he was suffering from a disease and that his actions were a product of that disease; whether, therefore, the proper disposition of such a person is to a treatment facility rather than to a penal institution. I think the question should be answered in the affirmative.

In the long-standing debate over criminal responsibility there has always been a strong conviction in our jurisprudence that to hold a man criminally responsible his actions must have been voluntary, the product of a "free will."[1] Accordingly, when there has been a consensus that in a certain type of case free will is lacking, the defendant in such a case may raise involuntariness as a defense to criminal prosecution. This has been true where various forms of automatism have been claimed,[2] where a person has acted under

---

denied, 384 U.S. 994, 86 S.Ct. 1903, 16 L.Ed.2d 1009 (1966); Horton v. United States, 115 U.S.App.D.C. 184, 317 F.2d 595 (1963).

9. Appellant Salzman's argument carries to the brink of a request that we overrule our holding that "the law has no separate concept of a legally acceptable ailment which *per se* excuses the sufferer from criminal liability." Carter v. United States, *supra* note 3 at 236, 252 F.2d at 617. I, of course, would not take such a step. These observations on the relationship between alcoholism and criminal responsibility are consistent with the views of other courts. *See* United States v. Malafronte, 357 F.2d 629 (2d Cir. 1966); District of Columbia v. Phillips, Crim.Nos. 854–55–67, Court of General Sessions, April 26, 1967.

1. *See, e. g.,* 4 W. BLACKSTONE, COMMENTARIES 20–21 (1854). Burdick has summed up this requirement:

"In addition to an act, a mental element, variously called 'the will,' 'the intent,' 'the evil intent,' 'the guilty mind,' and 'the criminal intent,' is necessary to constitute a crime. This is an inherent requirement of justice, since to punish one for an act for which he was in no way mentally responsible would be a denial of all justice. Consequently, in every crime there must be a mental element, that is, such a state or condition of mind that makes the doer of a criminal act responsible for that act and, therefore, liable to punishment.

" 'There must be,' says Blackstone, 'both a will and an act'; and Hale has stated that 'where there is no will to commit an offense, there can be no transgression.' Bishop has also said that 'there can be no crime great or small without an evil mind.'

"Mr. Justice Holmes has remarked that 'an act imports intention in a certain sense. It is a muscular contraction and something more. A spasm is not an act. The contraction of the muscles must be willed.' * * * "

1. W. BURDICK, THE LAW OF CRIME § 110 (1946). (Footnote omitted.)

2. G. WILLIAMS, CRIMINAL LAW 484–485 (2d ed.1961, The General Part):

"In the type of case just considered, where the defendant has attacked another during sleep, there is generally

external threat of compulsion,[3] and where a person has been involuntarily made intoxicated by the actions of others.[4] And, of course, there has been the long tradition in the area of mental illness that:

"* * * [A] person may commit a criminal act, and yet not be responsible. If some controlling disease was, in truth, the acting power within him which he could not resist, then he will not be responsible. * * * " [5]

In deciding responsibility for crime, therefore, the law postulates a "free will" and then recognizes known deviations. Thus the postulates can be undermined in certain areas where there is a broad consensus that free will does not exist. Once there is such a consensus, as in the mental illness area today, the jury is allowed to inquire whether the particular

no doubt that he is not responsible in law, and the only question relates to the form of the verdict and the consequent disposition of the defendant. It is otherwise where the defence of automatism is raised in relation to the ordinary affairs of waking life. Persons charged with crime—even such an offence as shoplifting—sometimes say that they do not know why they did it, but had a black-out at the time. This is too easy a line of defence to be acceptable to a court in the absence of convincing medical evidence. Nevertheless, it is a perfectly possible defence if adequately supported. Thus where a sufferer from diabetes took an overdose of insulin and another drug, which induced in him a kind of a dream-state, this evidence was held by the Court of Criminal Appeal to be capable of amounting to a defence to a charge of shopbreaking. * * * "
(Footnotes omitted.)

3. *See, e.g.,* 4 W. BLACKSTONE, *supra* Note 1, 27–32; Gillars v. United States, 87 U.S.App.D.C. 16, 30, 182 F.2d 962, 976 (1950).

4. 1 J. BISHOP, CRIMINAL LAW § 405 (9th ed.1923). Voluntary intoxication, on the other hand, was considered as "an aggravation of the offense, rather than as an excuse for any criminal misbehavior." 4 W. BLACKSTONE, *supra* Note 1, 26. Even the most moralistic courts, however, have recognized that long term drinking may sometimes relieve a person of criminal responsibility if it induces a "fixed frenzy":
"* * * A drunkard is a voluntary demon, and his intoxication gives him no privilege. If, however, an habitual or fixed frenzy is produced by this practice, though such madness is contracted by the vice and will of the party, it places the man in the same condition as if it were contracted, at first, involuntarily. * * * "

United States v. Forbes, E.D.Pa., 25 Fed.Cas. pp. 1141, 1142–1143 (No. 15,-129) (1845). In one case the curious result was reached that, although a chronic drinker could not claim insanity if he committed a crime in an intoxicated state, he could raise the defense if his insane state was the result of severe withdrawal symptoms caused by stopping his drinking. United States v. Drew, D. Mass., 25 Fed.Cas. p. 913 (No. 14,993) (1828).

In the now famous case of State v. Pike, N.H.Sup.Jud.Ct. 49 N.H. 399 (1869), the trial court had instructed the jury:
"* * * 'that whether there is such a mental disease as dipsomania, and whether the defendant had that disease, and whether the killing of Brown was the product of such disease, were questions of fact for the jury.' "
49 N.H. at 407–408. In a general discussion of criminal responsibility, the court stated:
"* * * When disease is the propelling, uncontrollable power, the man is as innocent as the weapon,—the mental and moral elements are as guiltless as the material. If his mental, moral, and bodily strength is subjugated and pressed to an involuntary service, it is immaterial whether it is done by his disease, or by another man, or a brute or any physical force of art or nature set in operation without fault on his part. * * * "
49 N.H. at 441.

5. Regina v. Oxford, 173 Eng.Rep. 941, 950 (1840) (Lord Denman). This jurisdiction has dealt extensively with this area. Washington v. United States, 129 U.S. App.D.C. 29, 390 F.2d 444 (1967); McDonald v. United States, 114 U.S.App. D.C. 120, 312 F.2d 847 (1962) (*en banc*); Durham v. United States, 94 U.S.App. D.C. 228, 214 F.2d 862 (1954).

person claiming to be within that class lacked the free will necessary for criminal responsibility. No reason appears why this concept should not be applied to any disease.[6] The question is whether society recognizes that the behavior pattern in question is caused by the diseased determinants and not free will.[7] If so, there should be no criminal responsibility. In determining societal recognition, four areas should be explored: (1) medical opinion, (2) the existence of treatment methods and facilities, (3) legal opinion, and (4) governmental recognition (legislative, executive and judicial). On exploration, I find sufficient consensus to hold, as a matter of law, that chronic alcoholism is a disease which in some instances may control behavior and that in those instances where it does, criminal sanctions may not be imposed.[8]

## II

### Medical Opinion

There are various definitions of alcoholism used in the medical profession. One group focuses on the physically debilitating and antisocial effects of chronic heavy drinking. For example, Keller states:

"Alcoholism is a chronic disease, or disorder of behavior, characterized by the repeated drinking of alcoholic beverages to an extent that exceeds customary dietary use or ordinary compliance with the social drinking customs of the community, and which interferes with the drinker's health, inter-personal relations or economic functioning." [9]

Another group focuses on the addictive nature of the alcoholic. Plaut describes it as:

"a condition in which an individual has lost control over his alcohol intake in the sense that he is consistently unable to refrain from drinking or to stop drinking before getting intoxicated." [10]

Similarly, a variety of etiological factors has been found, with disagreement as to which specific set of factors is a necessary or sufficient condition for the disease. In general, psychological factors, sometimes characterized in groups

6. This opinion discusses the disease of chronic alcoholism. It in no way alters the status of the law on voluntary intoxication. Voluntary intoxication is not a defense to a crime of general intent (as noted *supra* Note 4, it has been considered as an aggravation of the offense). For crimes of specific intent, voluntary intoxication can be a defense if the defendant can show that he was so drunk at the time of the crime he could not have formulated the necessary intent. *See* Parker v. United States, 123 U.S.App.D.C. 343, 359 F.2d 1009 (1966).

7. This approach is a recognition that notions of criminal responsibility, free will, disease, and moral culpability are community beliefs, subject to evolution and change in light of scientific advances or exposure to particular problems.

8. The safety of society is not ignored by such an approach. One of the operative factors which must be present before the defense of disease is applied to a class of behavior is the existence of treatment methods and facilities. Analogously to the mental illness area, no promise of complete cures in every case is needed.

Reasonable estimates that the facilities can be effective should suffice.

On the other hand, in order to protect the individual from "over-protective" custodial care for the rest of his life, some limitations on his treatment might be imposed. For example, the maximum length of time for commitment to a treatment facility might be the maximum term for the crime with which he was charged. Further, treatment—not just custodial warehousing—would be required. *Cf.* Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451 (1967). And, since no element of mental disease is necessarily involved, it would be open to the defendant not to raise the defense of disease, opting instead for the criminal sanction route. The trial judge should, if it appears to him that a defendant might be suffering from alcoholism, inform the defendant of his right to raise the disease as a defense.

9. Quoted in U. S. DEPARTMENT OF HEALTH, EDUCATION AND WELFARE, ALCOHOL AND ALCOHOLISM 6 (1968).

10. T. PLAUT, ALCOHOL PROBLEMS 39 (1967).

as "personality disorders," are said to be a causative factor, along with cultural and physiological determinants.[11] Different types of alcoholics are found; Jellinek's noted division of alcoholics into five types is a major work in the area.[12]

That there is no clear definition of alcoholism and no complete agreement as to its causes is not a ground for denying it disease status. The same might be said of cancer or epilepsy; certainly the same can be said for mental illness. There is a profusion of definitions of various mental disorders, and strong debate over whether or not they are illnesses and what their causes are. For example, in one instance psychiatrists from St. Elizabeths Hospital testified that a sociopathic personality disturbance was not to be considered a mental disease or defect; one month later psychiatrists from the same staff testified to the opposite effect.[13]

The point is not whether the medical profession has come up with an exact label. Rather, the approach is functional—does the medical profession, or a substantial part of it, view alcoholism as a disease, properly the subject of medical treatment? It seems clear that, measured by this test, alcoholism does qualify as a disease.

Plaut, recommending such a broad functional view, states:

"Alcoholism then is considered an 'illness' in the light of a comprehensive health view which includes an awareness of: (1) the multiplicity of causal factors; (2) the probable existence of many different courses of development (rather than a single course of development); and (3) the need to utilize a variety of treatment and preventive approaches, non-medical as well as medical." [14]

In 1968 Dr. J. H. Mendelson, head of the National Center for Prevention and Control of Alcoholism at the National Institute of Mental Health, noted:

"During the past two decades, significant advances have been made in both public and professional acceptance that alcoholism is a disease rather than a form of moral transgression. The health professions have assumed leadership in developing a contemporary approach to the study and treatment of alcoholism which incorporates scientific and humanistic goals. Most recently the courts have adopted legislative precedents which view the alcoholic as an ill individual and the process of litigation and confinement of alcoholic patients hopefully will soon disappear." [15]

Finally, in 1956 the Committee on Alcoholism of the Council of Mental Health of the American Medical Association passed a formal resolution that " * * * the profession in general recognizes this syndrome of alcoholism as illness which justifiably should have the attention of physicians." [16]

*Treatment Methods and Facilities*

Since alcoholism has only recently received the medical attention the medical profession now feels it deserves, it is not surprising that the availability of treatment methods, and especially treatment

11. *See, e.g.*, AMERICAN PSYCHIATRIC ASSOCIATION, CLINICAL RESEARCH IN ALCOHOLISM Ch. II, III, VII, VIII, IX (Cole ed.1968); O. DIETHELM, ETIOLOGY OF CHRONIC ALCOHOLISM (1955); D. PITTMAN & C. SNYDER (ed.), SOCIETY, CULTURE AND DRINKING PATTERNS (1962); T. PLAUT, *supra* Note 10, 37–52; ALCOHOL AND ALCOHOLISM, *supra* Note 9, Ch. V, VI, VII; Zwerling & Rosenbaum, Alcoholic Addiction and Personalty, 1 AMERICAN HANDBOOK OF PSYCHIATRY 623 (1959).

12. E. JELLINEK, THE DISEASE CONCEPT OF ALCOHOLISM (1960).

13. Blocker v. United States, 107 U.S.App. D.C. 63, 274 F.2d 572 (1959).

14. T. PLAUT, *supra* Note 10, 45.

15. Mendelson, The National Center for Prevention and Control of Alcoholism, NIMH, CLINICAL RESEARCH IN ALCOHOLISM, *supra* Note 11, 174.

16. Quoted in Zwerling & Rosenbaum, *supra* Note 11, 624.

facilities, lags behind the need.[17] However, in recent years there has been a burgeoning of methods and a rapid increase in facilities for alcoholics. While recognizing how much farther we have to go, I feel that we have now progressed sufficiently to route alcoholics out of the criminal process and into a treatment process.

Various methods have been, and are being, used with alcoholics. Psychotherapy,[18] group therapy,[19] drug therapy,[20] and a host of special programs such as aversive conditioning, hypnotherapy and group psychodrama[21] have received discussion in the literature. And every authority recognizes that a very important aid to any treatment program exists—Alcoholics Anonymous.[22]

These treatment methods will undoubtedly be altered, new ones added, and old methods revived as the profession seeks surer ways to return the alcoholic to a normally functioning life. This is true in almost all aspects of medicine, and especially true of the treatment of mental illness. What is important is that methods are being used, apparently with some success,[23] to treat alcoholics. Also encouraging is the work of Chafetz and others[24] showing that "unmotivated"

patients can be worked with. As Plaut notes:

"* * * Evidence is accumulating that changes in the organization, operation, and treatment philosophy of an agency can have a substantial effect on its ability to work with the supposedly unmotivated patient. * * *"[25]

Although much needs to be done in creating treatment facilities, a great deal has already been accomplished. Alcoholics can receive in-patient care in some state hospitals,[26] and emergency care in a variety of emergency services.[27] Further, alcoholism clinics are being established at a rapid pace, with more than 130 in existence as of 1966.[28] The community mental health centers being developed throughout the country have a great potential for treatment of alcoholics.[29]

Finally, as discussed below, there is a massive movement in the states and at the federal level toward establishing research and treatment facilities for alcoholics. This movement is resulting in a tremendous increase in the number of facilities and methods employed to treat alcoholism.

17. *See, e.g.*, Barton, Deficits in the Treatment of Alcoholism and Recommendations for Correction, ALCOHOLISM AND PSYCHIATRIC EMERGENCY SERVICES 1679–1685 (1968); Blane, Trends in the Prevention of Alcoholism, CLINICAL RESEARCH IN ALCOHOLISM, *supra* Note 11, 1–9; Hill & Blane, Evaluation of Psychotherapy with Alcoholics, 28 QUART. J. OF STUDIES ON ALCOHOL 76–104 (1967); T. PLAUT, *supra* Note 10, 53–54.

18. Zwerling & Rosenbaum, *supra* Note 11, 641; ALCOHOL AND ALCOHOLISM, *supra* Note 9, 33.

19. Curtis, Group Therapy with Alcoholics, CLINICAL RESEARCH IN ALCOHOLISM, *supra* Note 11, Ch. V.

20. ALCOHOL AND ALCOHOLISM, *supra* Note 9, 33.

21. T. PLAUT, *supra* Note 10, 69.

22. "A most valuable adjunct to therapy." Zwerling & Rosenbaum, *supra* Note 11,

642. "The Unique Role of Alcoholics Anonymous." T. PLAUT, *supra* Note 10, 62. ALCOHOL AND ALCOHOLISM, *supra* Note 9, 35.

23. ALCOHOL AND ALCOHOLISM, *supra* Note 9, 37–38.

24. Chafetz, Research in the Alcohol Clinic and Around-the-Clock Psychiatric Service of the Massachusetts General Hospital, ALCOHOLISM AND PSYCHIATRIC EMERGENCY SERVICES, *supra* Note 17, 1674–1678.

25. T. PLAUT, *supra* Note 10, 81.

26. *Id.*, 62–64.

27. *Ibid.*; Chafetz, *supra* Note 24.

28. T. PLAUT, SOME MAJOR ISSUES IN DEVELOPING COMMUNITY SERVICES FOR PERSONS WITH DRINKING PROBLEMS 9 (1966).

29. ALCOHOL AND ALCOHOLISM, *supra* Note 9, 48.

*Legal Opinion*

The legal literature on the problem is just developing. Most of it centers on the two recent Circuit decisions holding that alcoholics cannot be punished for public drunkenness.[30] Of 20 law review case notes on these decisions, 13 commented favorably on the courts' approach to alcoholism along medical-rehabilitative lines (the remaining seven simply noted the cases; none commented unfavorably).[31] A typical note states:

> "By recognizing that alcoholism is a disease, the courts acknowledged a conclusion almost universally accepted by medical authorities. * * * [I]t is generally accepted by medical and psychiatric authorities that 'jail is no place for the alcoholic,' for he needs rehabilitation rather than punishment." (Footnotes omitted.)[32]

Further, almost all of the law reviews pointed to the implications of those decisions, and of our medical appreciation of alcoholism, for alcoholics accused of any crime.

Several writers have discussed the problem of alcoholism, concluding that it is essentially a medical, not a criminal, one.[33] It is instructive that the President's Commission on Law Enforcement and Administration of Justice, Task Force on Drunkenness, singled out an article by Hutt to include in its appendix. Hutt concluded:

> "Judges and lawyers are trained in the law. We are not competent to decide exactly what type of noncriminal public health procedures are most likely to result in rehabilitation of chronic inebriates. But we are competent, and we do have the duty, to make certain that the present criminal procedures are not continued. The public cannot be expected to respect a system of criminal justice that condemns sick people to jail because they are sick. * * * *"[34]

*Governmental Recognition*

In this area, perhaps more clearly than in any of the others, the recognition that alcoholism is a disease is overwhelming.

1. *Legislative: Congress*

As long ago as 1947 Congress recognized alcoholism as a disease when it enacted a law for the rehabilitation of alcoholics.[35] The first section of that law stated:

> "The purpose of this chapter is to establish a program for the rehabilitation of alcoholics, promote temperance, and provide for the medical, psychiatric, and other scientific treatment of chronic alcoholics; * * * and to substitute for jail sentences for

---

**30.** Driver v. Hinnant, 4 Cir., 356 F.2d 761 (1966); Easter v. District of Columbia, 124 U.S.App.D.C. 33, 361 F.2d 50 (1966) (*en banc*).

**31.** The 13 favorable law review notes were: 8 Ariz.L.Rev. 351 (1967); 33 Brooklyn L.Rev. 324 (1967); 52 Cornell L. Q. 470 (1967); 1966 Duke L.J. 545 (1966); 54 Geo.L.J. 1422 (1966); 4 Houston L.Rev. 276 (1966); 55 Ky.L.J. 201 (1966); 27 La.L.Rev. 340 (1967); 12 S.D.L.Rev. 142 (1967); 41 Tul.L. Rev. 140 (1966); 1966 U.Ill.L.F. 767 (1966); 11 Vill.L.Rev. 861 (1966); and 23 Wash. & Lee L.Rev. 402 (1966). The seven other notes were: 20 Ark.L. Rev. 365 (1967); 16 DePaul L.Rev. 493 (1967); 13 How.L.J. 203 (1967); 44 N.C.L.Rev. 818 (1966); 22 Rutgers L. Rev. 103 (1967); 7 W. & M.L.Rev. 394 (1966); and 12 Wayne L.Rev. 879 (1966).

**32.** Note, 27 La.L.Rev. 340, 342–343 (1967).

**33.** Hutt, The Recent Court Decisions on Alcoholism: A Challenge to the North American Judges Association and Its Members, President's Commission on Law Enforcement and Administration of Justice, Task Force on Drunkenness (hereafter President's Commission), Appendix H, 109–119 (1967); Hutt & Merrill, Is the Alcoholic Immune from Criminal Prosecution?, 6 Mun.Ct.Rev. 5 (1966); Murtagh, Arrests for Public Intoxication, 35 Fordham L.Rev. 1 (1966); Slovenko, Alcoholism and the Criminal Law, 6 Washburn L.J. 269 (1967); Kirbens, Chronic Alcohol Addiction and Criminal Responsibility, 54 A.B.A.J. 877 (1968).

**34.** Hutt, *supra* Note 33, 118–119.

**35.** 24 D.C.Code §§ 501–514 (1967) (enacted 61 Stat. 744 (1947)).

drunkenness medical and other scientific methods of treatment which will benefit the individual involved and more fully protect the public. In order to accomplish this purpose and alleviate the problem of chronic alcoholism, the courts of the District of Columbia are hereby authorized to take judicial notice of the fact that a chronic alcoholic is a sick person and in need of proper medical, institutional, advisory, and rehabilitative treatment * * * *."[36]

In 1968 Congress substituted for this Act another, Public Law 90–452, 90th Congress (August 3, 1968), which embodies the same policy. The new law goes even further. It not only provides for civil commitment of alcoholics, it also provides that any chronic alcoholic arrested for *any* misdemeanor can be civilly committed if he, "prior to trial for such misdemeanor, voluntarily requests such treatment in lieu of criminal prosecution for such misdemeanor." Section 7(b) (1) (A). The maximum term of commitment cannot exceed the maximum term of imprisonment for the misdemeanor charged. Responsibility is given the Commissioner of the District of Columbia to create detoxification centers and in- and out-patient treatment facilities.

### 2. Legislative: States

State recognition of alcoholism as a medical problem has been massive. Forty-two states have passed laws, the large majority within the past ten years, which recognize alcoholism as a medical problem, establish research facilities, and authorize treatment facilities.[37] Typical is Maryland's, the first section of which states:

"Alcoholism is hereby recognized as an illness and a public health problem

---

36. 24 D.C.Code § 501 (1967).

37. The state laws are (years cited are the years the laws were enacted):
Ala.Code Tit. 55 § 373(11) (1959).
Alaska Stat. § 47.30.470 (1966).
Ark.Stat.Ann. §§ 83–701–717 (1955).
Cal.Health & Safety Code § 427–427.13 (1965).
Conn.Gen.Stat.Ann. § 17–155a–j (1961).
Fla.Stat. § 396.011–.121 (1953).
Ga.Code Ann. §§ 88–401–412 (1964).
Idaho Code Ann. §§ 67–3108–3120 (1965).
Ill.Rev.Stat. ch. 34 § 429.16 (1967), ch. 91½ § 100–10 (1961).
Ind.Ann.Stat. §§ 22–1501–1513 (1957).
Iowa Code § 123A.1–.8 (1961).
Kan.Stat.Ann. §§ 74–4401–4413 (1953).
Ky.Rev.Stat. § 222.020–.195 (1960).
La.Rev.Stat. § 40–2008–8.3 (1958).
Me.Rev.Stat.Ann. Tit. 22 §§ 1351–1355 (1954).
Md.Ann.Code art. 2C §§ 1–4 (1960).
Mass.Gen.Laws § 123.80 (1962).
Mich.Stat.Ann. § 330.18 (1949), § 436.-47a (1951).
Minn.Stat. § 144.81–.84 (1957), § 144.-831–.834 (1967), § 253A.03, .07 (1967).
Neb.Rev.Stat. §§ 83–157–169 (1967), § 83–307.01–03 (1951).
Nev.Rev.Stat. § 433.250–.290 (1967).
N.H.Rev.Stat.Ann. § 172.1–.14 (1947, 1967).
N.J.Rev.Stat. §§ 26:2B–1–6 (1948).
N.M.Stat.Ann. §§ 46–12–1–13 (1949), § 46–12.7 (1967).
N.Y.Mental Hygiene Law §§ 301–309 (1965).
N.C.Gen.Stat. § 122.7.1 (1961), §§ 122.35.13–.17 (1967), § 122.65.6–.9 (1967).
N.D.Cent.Code §§ 23–17.1–01–07 (1965), § 54–01–19, subd. 4 (1953), §§ 54–38–01–09 (1965).
Ohio Rev.Code § 3701.141 (1959).
Okla.Stat. Tit. 630 §§ 2101–2108 (1968).
Ore.Rev.Stat. §§ 430.020, .080–.100 (1961).
Pa.Stat. Tit. 50 §§ 2101–2113 (1953).
R.I.Gen.Laws Ann. § 11–45–1 (1962), §§ 40–12–1–23 (1951).
S.C.Code Ann. §§ 32–895–904 (1967).
S.D.Sess.Laws 1967, ch. 127, 281 (March 14, 1967).
Tenn.Code Ann. §§ 33–801–811 (1963).
Tex.Rev.Civ.Stat. art. 5561c (1953, 1967).
Utah Code Ann. §§ 55–13–1–7 (1957, 1967).
Vt.Stat.Ann. Tit. 18 §§ 8401–8462 (1967).
Va.Code Ann. § 18.1–200.1 (1966), § 32.378.1–.4 (1966).
Wash.Rev.Code §§ 70.96.010–.900 (1957, 1965).
W.Va.Code Ann. § 27–6–1–5 (1965).
Wis.Stat. § 51.09 (1935, 1963), § 51.25 (1963).

affecting the general welfare and economy of the State. Alcoholism is further recognized as an illness subject to treatment and· recovery  *  *  *." [38] Of these states, 24 provide, in addition, for the civil commitment of a chronic alcoholic who is dangerous to himself or to others.[39]

### 3. *Executive*

In March 1966 President Johnson addressed Congress regarding the health and education problems in the United States. He stated:

"The alcoholic suffers from a disease which will yield eventually to scientific research and adequate treatment. Even with the present limited state of our knowledge, much can be done to reduce the untold suffering and uncounted waste caused by this affliction.

I have instructed the Secretary of Health, Education, and Welfare to:

—appoint an Advisory Committee on Alcoholism;

—establish in the Public Health Service a center for research on the cause, prevention, control and treatment of alcoholism;

—develop an education program in order to foster public understanding based on scientific fact;

—work with public and private agencies on the State and local level [to] include this disease in comprehensive health programs." [40]

### 4. *Judicial*

In two Circuit decisions, Driver v. Hinnant, 4 Cir., 356 F.2d 761 (1966), and Easter v. District of Columbia, 124 U.S. App.D.C. 33, 361 F.2d 50 (1966) (*en banc*), the courts held that an alcoholic could not be convicted of public drunkenness. Crucial to each holding was a recognition that alcoholism is a disease:

"This addiction—chronic alcoholism —is now almost universally accepted medically as a disease. The symptoms, as already noted, may appear as 'disorder of behavior'. Obviously, this includes appearances in public, as here, unwilled and ungovernable by the victim. When that is the conduct for which he is criminally accused, there can be no judgment of criminal conviction passed upon him.  *  *  *"

*Driver*, 356 F.2d at 764.  (Footnote omitted.)

" *  *  * [Alcoholism is defined by the Congressional Act of 1947] as a 'sickness,' and Congress did not find it necessary to specify whether it is mental, physical or a combination of both. Whatever its etiological intricacies it is deemed a sickness which is accompanied with loss of power to control the use of alcoholic beverages. The congressional judgment is supported not only by the evidence in this case adduced in the Court of General Sessions but by the record of the hearings on the Act of 1947, the entire legislative history of the Act, and by an additional abundance of authorities *  *  *.  As Congressman Miller of Nebraska stated on the floor of the House during the debate on the Act:

Jail is not the answer to their trouble. We think they are sick people and need scientific and technical attention of psychiatrists and medical personnel."

---

38. MD.CODE Article 2C § 1 (1960).

39. These states are: Arkansas, Connecticut, Georgia, Indiana, Kansas, Kentucky, Maine, Massachusetts, Minnesota, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Pennsylvania, Rhode Island, Tennessee, Texas, Vermont, Virginia, West Virginia and Wisconsin. For code cites, *see* Note 37.

In addition, three other states provide for the commitment of alcoholics: Miss. Code Ann. §§ 436–01–12 (1950); Mont. Rev.Code Ann. §§ 38–701–711 (1911); and Wyo.Stat.Ann. § 25–32 (1899).

Hawaii is not included in the compilations of state laws in Notes 37 and 39; the Hawaii code was unavailable at the time this was written.

40. Quoted in PRESIDENT'S COMMISSION, *supra* Note 33, 22.

*Easter*, 124 U.S.App.D.C. at 35, 361 F.2d at 52. (Footnote omitted.)

*Conclusion*

From the examination of medical opinion, legal opinion, treatment methods and facilities, and governmental recognition, it seems clear that alcoholism is a disease, properly the subject of medical attention instead of criminal sanction. Therefore, this court should fashion a rule regarding alcoholism so that persons claiming to suffer from the disease can take to the jury the issue of whether, in each case, the criminal responsibility needed for conviction is lacking.

### III

The question of alcoholism as a defense to crime is being treated here as a question of criminal responsibility. "In the District of Columbia, the formulation of tests of criminal responsibility is entrusted to the courts * *." [41] The issue is not one of constitutional mandate (the Eighth Amendment's proscription of cruel and unusual punishment) nor one of statutory interpretation (the 1947 Act of Congress).

It follows that we are not compelled to rely on the basis for the decision in *Driver, supra* (Eighth Amendment), or in *Easter, supra* (1947 Act and, in part, Eighth Amendment).[42] And, therefore, the Supreme Court's opinions in Powell v. State of Texas, 392 U.S. 514, 88 S.Ct.

2145, 20 L.Ed.2d 1254 (1968), are not a constraint. There a divided Court affirmed a Texas conviction for public drunkenness, holding that the Eighth Amendment did not prohibit such a conviction. The Court was dealing at a constitutional level; in fact, Mr. Justice Marshall's opinion explicitly applauded experimentation among the jurisdictions in dealing with criminal responsibility:

"* * * [F]ormulating a constitutional rule would reduce, if not eliminate, that fruitful experimentation, and freeze the developing productive dialogue between law and psychiatry into a rigid constitutional mold. * *"

392 U.S. at 536–537, 88 S.Ct. at 2157.

In this spirit, I think that the dialogue over alcoholism among the medical profession, the government and the legal profession has reached a point where the disease should be recognized as a basis for denying criminal responsibility for any actions produced by the disease. The rule I would fashion for alcoholism parallels this court's rule in the area of insanity. The jury would be instructed that if it finds that the defendant was suffering from a disease, and that his actions were a product of that disease, it should find the defendant not guilty. Using civil commitment procedures, the defendant should then·be committed to an appropriate treatment facility.[43] As with insanity, labels should be avoided.

---

41. Durham v. United States, *supra* Note 5, 94 U.S.App.D.C. at 240, 214 F.2d at 874.

42. Those cases do, however, shed light on this area in their discussions of disease as negating criminal responsibility. *Driver*, 356 F.2d at 764:

"Although his misdoing objectively comprises the physical elements of a crime, nevertheless no crime has been perpetrated because the conduct was neither actuated by an evil intent nor accompanied with a consciousness of wrongdoing, indispensable ingredients of a crime. * * * Nor can his misbehavior be penalized as a transgression of a police regulation—malum prohibitum—necessitating no intent to do what it punishes. The alcoholic's presence in public is not his act, for he

did not will it. It may be likened to the movements of an imbecile or a person in a delirium of a fever. * * *"

*Easter*, 124 U.S.App.D.C. at 35, 361 F. 2d at 52:

"* * * An essential element of criminal responsibility is the ability to avoid the conduct specified in the definition of the crime. Action within the definition is not enough. To be guilty of the crime a person must engage responsibly in the action. Thus, an insane person who does the act is not guilty of the crime. The law, in such a case based on morals, absolves him of criminal responsibility. So, too, in case of an infant. * * *"

43. Under the civil commitment statute, 21 D.C.Code §§ 501–591 (1967), persons suffering from mental illness can be com-

In each case experts should not only identify the disease, but also the symptoms thereof and how the behavior of the defendant was affected by his illness.[44] Thus evidence that his action was or was not a product would be particularized in each case. It would, of course, be hard to make a product showing[45]; however, in those cases where such a showing is made, there is no rea-

mitted. Mental illness is defined as "a psychosis or other disease which substantially impairs the mental health of a person." 21 D.C.CODE § 501. Under this definition, for purposes of commitment, I think that an alcoholic would come within the statute and could be civilly committed if dangerous to himself or others.

Commitment of alcoholics under this statute is separate from the provisions of 24 D.C.CODE § 501 et seq., as amended in August 1968 (Alcoholic Rehabilitation Act of 1967, Public Law 90–452, 90th Congress). Those sections provide for civil commitment of alcoholics for a period of up to 30 days, or in repeated cases up to 90 days. In addition that Act provides for commitment in lieu of prosecution for misdemeanants who prior to trial choose to be committed to a treatment center. This commitment cannot exceed the maximum term of imprisonment for the misdemeanor charged.

This opinion is intended to cover only those situations where the Alcoholic Rehabilitation Act does not apply. Thus the opinion is intended to apply to defendants charged with committing a felony. However, I note that under § 7(b)(2) of that Act, the Act does not apply to misdemeanants unless there are available "adequate and appropriate treatment" facilities. In a case where the Act is held inapplicable for such a reason, this opinion would apply.

I wish to make clear that declaring alcoholism a mental illness within the terms of the commitment statute in no way indicates that it is a mental illness within the terms of the insanity defense. Indeed, this opinion has stressed that alcoholics should be relieved of criminal responsibility where their actions were produced by their disease, not because the disease is a mental illness, but simply because, mental or physical or both, it is a disease.

Commitment would not be automatic; as with mental illness, there would need to be an independent hearing. See Bolton v. Harris, 130 U.S.App.D.C. 1, 395 F.2d 642 (1968).

44. As noted above, there is no medical agreement on an exact definition of alcoholism. Some definitions emphasize the excessive drinking and the socially debilitating aspects of the disease, others the compulsive nature of the drinking. In this area, as with mental illness:

"* * * [S]ince the question of whether the defendant has a disease or defect is ultimately for the triers of fact, obviously its resolution cannot be controlled by expert opinion. * * *" McDonald v. United States, supra Note 5, 114 U.S.App.D.C. at 124, 312 F.2d at 851.

In McDonald the court gave a legal definition of insanity which the jury was to apply. In this area as well, a McDonald approach should be our guide. However, that case was not decided until the courts had had eight years of experience with the Durham rule. At this juncture it seems best to wait until the trial courts and juries have some experience with expert testimony on the nature of alcoholism before fashioning a judicial definition of the disease.

45. The test for "product" in the insanity area was stated in Carter v. United States, 102 U.S.App.D.C. 227, 236, 252 F.2d 608, 617 (1957):

"* * * [T]he facts concerning the disease and the facts concerning the act are such as to justify reasonably the conclusion that 'But for this disease the act would not have been committed.'"

The dissenters in Powell v. State of Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), who would have held it unconstitutional to punish public drunkenness, assumed that such a showing would not arise for other acts:

"It is not foreseeable that findings such as those which are decisive here—namely that the defendant's being intoxicated in public was a part of the pattern of his disease and due to a compulsion symptomatic of that disease—could or would be made in the case of offenses such as driving a car while intoxicated, assault, theft, or robbery. Such offenses require independent acts or conduct and do not typically flow from and are not part of the syndrome of the disease of chronic alcoholism. If an alcoholic should be convicted for criminal conduct which is not a characteristic and involuntary part of the pattern of the

son to hold the defendant criminally responsible.

The test I am proposing is not novel. In our own jurisdiction Judge Tim Murphy of the District of Columbia Court of General Sessions formulated just such a test in the case of an alcoholic charged with disorderly conduct:

> " * * * [I]f the defendant can show that he is a chronic alcoholic and was intoxicated at the time of the offense, he will still have to show that his conduct at the time of the offense was involuntary. The crux here is his degree of self-control, awareness. * * * [I]f he was so drunk that he had lost control * * * of his actions, he should be found not guilty." [46]

I think that in future cases chronic alcoholics should be allowed to attempt such a showing.

## SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

The setting in which we must examine Salzman's appeal is a relatively short and uncomplicated sequence of litigative events. At his trial, on an indictment for robbery,[1] the Government introduced evidence, which, if believed by the jury, proved that he had participated in the crime. Salzman, on the other hand, related that he had been drinking extensively before the robbery took place, and that he could recall little about the day on which it occurred. He brought out, too, that he had been arrested for drunkenness on many occasions previously, and had also been adjudged a chronic alcoholic.[2] Other testimony, however, added little to the significance of the latter event.[3]

The trial judge, with the approbation[4] of Salzman's trial counsel,[5] instructed the jury in substance that chronic alcoholism is not *per se* a defense to robbery, but that the accused's capacity to form a specific intent to steal was a prerequisite to conviction for that offense.[6] Having been found guilty as charged, Salzman now contends that the judge, in his instructions, should have distinguished between voluntary and involuntary intoxication, and should have told the jury to acquit if his acts were a product of his chronic alcoholism.

---

disease as it afflicts him, nothing herein would prevent his punishment." 392 U.S. at 559 n. 2, 88 S.Ct. at 2167 (dissenting opinion of Mr. Justice Fortas). These Justices would seem to be open, however, to a showing that some act *was* a "characteristic and involuntary part of the pattern of the disease as it afflicts" the defendant.

The *Powell* dissenters' assumption, however, may not be so clear. For a discussion of the relationship between alcohol and criminal behavior, *see* Slovenko, *supra* Note 33; Pittman, Public Intoxication and the Alcoholic Offender in American Society, PRESIDENT'S COMMISSION, *supra* Note 33, 13.

46. District of Columbia v. Phillips, Criminal Nos. DC 854-55-67 (unreported), reprinted in 113 CONG.REC. H5584 (May 16, 1968, daily ed.), at H5587.

1. D.C.CODE § 22-2901 (1967).

2. This adjudication occurred in August, 1966, the same month in which the robbery was committed.

3. See note 17, *infra*, and accompanying text.

4. See note 22, *infra*, and accompanying text.

5. Not his counsel on this appeal.

6. Voluntary drunkenness, see note 11, *infra*, is not of itself an excuse for crime. King v. United States, 125 U.S.App.D.C. 318, 323, 372 F.2d 383, 388 (1966); Bishop v. United States, 71 App.D.C. 132, 136, 107 F.2d 297, 301-302 (1939). It is, however, relevant to and may negate specific intent. Heideman v. United States, 104 U.S.App.D.C. 128, 131, 259 F.2d 943, 946 (1958), cert. denied, 359 U.S. 959, 79 S.Ct. 800, 3 L.Ed.2d 767 (1959); Proctor v. United States, 85 U.S.App.D.C. 341, 177 F.2d 656 (1949); Sabens v. United States, 40 App.D.C. 440, 443 (1913). Compare Parker v. United States, 123 U.S.App.D.C. 343, 346-347, 359 F.2d 1009, 1012-1013 (1966).

In Easter v. District of Columbia,[7] we held that the Rehabilitation of Alcoholics Act [8] "preclude[s] attaching criminality in this jurisdiction to intoxication in public of a chronic alcoholic." [9] Since the role of alcoholism in the criminal process is undeniably a problem to be reckoned with in more than a single context, Salzman not unnaturally frames for our consideration broad and difficult issues concerning the potentialities of chronic alcoholism in the defense of crime other than public inebriation.[10] Is chronic alcoholism, in its relation to criminality generally, to be dealt with as a form of involuntary intoxication,[11] mental illness [12] or exculpating sickness [13] on the theory that he who is inflicted with it had an irresistible compulsion to drink and after drinking loses his power of self-restraint? Can he, any more than one whose behavioral controls are substantially impaired by mental disease or defect,[14] be justly assessed with criminal responsibility? [15]

These are among the questions Salzman would have us decide.

Clarification of the law in these areas would, of course, be highly desirable, and acceptance of Salzman's invitation would shed some much needed light on these vexing problems. But principles basic in our jurisprudence, fortified by the lessons of history, caution against judicial conclusions—including those on chronic alcoholism [16]—that are not firmly supported by concrete evidence. Here we have virtually no evidence on the subject integral to the overall inquiry. A clinical specialist in alcoholism for the District of Columbia Department of Health, defining a chronic alcoholic as a person who cannot master his drinking, testified that Salzman is an habitual imbiber who loses control over his drinking once he starts, but this is just about all that we are told.[17] Among the glaring evidentiary deficiencies are informational voids as to Salzman's ability to forego the first drink, and as to the

---

7. 124 U.S.App.D.C. 33, 361 F.2d 50 (en banc 1966).

8. 61 Stat. 744 (1947), D.C.Code §§ 24–501 to 24–514 (1967). But see District of Columbia Alcoholic Rehabilitation Act of 1967, 82 Stat. 618 (1968).

9. 124 U.S.App.D.C. at 35, 361 F.2d at 52. Compare Powell v. State of Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968).

10. Our Easter decision, supra note 7, did not touch issues of that character. See 124 U.S.App.D.C. at 35–36, 44, 361 F. 2d at 52–53, 61.

11. Even the common law recognizes the distinction between voluntary and involuntary intoxication—the former as a defense only if it precludes a specific intent which is an essential element of the crime, and the latter as a defense if present in a degree sufficient to destroy cognition. See generally W. Burdick, The Law of Crime 213, 216–21 (1946); R. Perkins, Criminal Law 777, 781–95 (1957); 1 Wharton, Criminal Law & Procedure 102–04 (R. Anderson ed.1957). See also People v. Koch, 250 App.Div. 623, 294 N.Y.S. 987 (1937) (conviction for operating motor vehicle while intoxicated reversed because intoxicating substance was taken for medicinal purposes); State v. Brown, 38 Kan. 390, 16 P. 259 (1888) (public drunkenness excused by ignorance of intoxicating potentiality of beverage).

12. See, e.g., Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954); McDonald v. United States, 114 U.S.App. D.C. 120, 312 F.2d 847 (en banc 1962).

13. See Easter v. District of Columbia, supra note 7, 124 U.S.App.D.C. at 35, 36, 361 F.2d at 52, 53.

14. See the cases cited supra note 12.

15. See Easter v. District of Columbia, supra note 7, 124 U.S.App.D.C. at 35, 361 F.2d at 52.

16. See Powell v. State of Texas, supra note 9, 392 U.S. at 517–531, 88 S.Ct. 2145.

17. Government witnesses expressed only their opinions on Salzman's state of sobriety at the time of the offense. Salzman himself, after testifying to his drinking prior to the robbery and his many arrests for intoxication, said only that "[s]ometimes you are high and sometimes you are higher and sometimes you just don't know what you are doing."

effect of his drinking on his power to govern his behavior. Thus we are left in the dark as to just how compulsive Salzman's drinking really is, and as to any causal relationship it bore to the otherwise criminal conduct for which he was convicted.

Moreover, the record discloses that Salzman asserted his alcoholism at trial only in an effort to negate the specific intent to steal which is an essential element of the crime of robbery.[18] That was the defense—and the sole defense— which his counsel advanced to the jury in opening statement[19] and in summation,[20] and to the trial court in connection with its instructions to the jury.[21] The court's charge, plainly and concisely, covered that theory of the case, and

trial counsel voiced satisfaction with the charge.[22]

In my view, any broader consideration of the interweave of chronic alcoholism in the fabric of the criminal law is doomed here by the almost complete lack of medical evidence,[23] and by the trial of the case on a claim too narrow to justify even a "plain error"[24] approach on Salzman's appeal.[25] In sum, we are not called upon, in order to dispose of his appeal, to render nearly so far-reaching a decision as Salzman seeks. I join in affirmance of his conviction, but would postpone performance of our duty to probe deeper into the mysteries of chronic alcoholism to the day when we are afforded an adequate record developed through adversary treatment of all vital issues at the trial level.

18. See the cases cited *supra* note 6.

19. Defense counsel's opening statement to the jury alluded to specific intent to steal as an essential element of the robbery with which Salzman was charged, and stated that Salzman would show that at the time of the offense he was under the influence of alcohol and that he had previously been adjudged a chronic alcoholic.

20. Salzman's counsel in closing argument called the jury's attention to the necessity of proof of specific intent in robbery cases, and urged the jury "to find the defendant not guilty of the crime of robbery by reason of the fact that he did not have the specific mental intent to do these acts on the day in question." Continuing, he said that Salzman had been "adjudicated a chronic alcoholic * * * who does drink without control and gets to a stage where his mind gets numb with alcohol;" hence, it was urged, "he had no specific intent to do these acts."

21. The Government requested, and the trial court informed counsel that it would give, an instruction to the effect that chronic alcoholism, standing alone, is not a defense to robbery, but that Salzman's condition should be taken into consideration on the question whether he was too intoxicated to form the necessary specific intent. Salzman's counsel requested only

"the intoxication instruction" and that the jury be told that Salzman's adjudication as a chronic alcoholic should be considered in the determination as to whether there was specific intent.

22. No objection was registered to the court's proposed instruction on this point. See note 21, *supra*. In response to the court's inquiry, after the court had instructed the jury precisely as it had stated that it would, Salzman's counsel said that he was "[s]atisfied."

23. Compare Powell v. Texas, *supra* note 9, 392 U.S. at 517–531, 88 S.Ct. 2145. *Powell* dealt with chronic alcoholism in the context of a constitutional claim, but its rationale, perhaps in somewhat smaller degree, is applicable to judicial resolution of nonconstitutional questions as well.

24. F.R.Crim.P. 52(b).

25. *See* Osborn v. United States, 385 U.S. 323, 332 n. 11, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966); Gaskins v. United States, U.S.App.D.C. (No. 20,252, Dec. 20, 1967) at 9 n. 30; Robertson v. United States, 124 U.S.App.D.C. 309, 310, 364 F.2d 702, 703 (1966); Kelly v. United States, 124 U.S.App.D.C. 44, 361 F.2d 61 (1966); Smith v. United States, 122 U.S. App.D.C. 300, 305, 353 F.2d 838, 843 (1965). See also F.R.Crim.P. 30.